(No. 45673.—

THE PEOPLE *ex rel.* WILLIAM J. SCOTT, Attorney General, Appellant, v. ILLINOIS RACING BOARD *et al.,* Appellees.

*Opinion filed June 4, 1973.—Rehearing denied Sept. 27, 1973.*

SCHAEFER, J., took no part.

WILLIAM J. SCOTT, Attorney General, of Springfield (FRED F. HERZOG, BERNARD GENIS, HERBERT L. CAPLAN and RICHARD ROBIN, Assistant Attorneys General, of counsel), for appellant.

MARTIN J. OBERMAN, of Chicago, for appellee Illinois Racing Board.

THOMAS D. NASH and ROBERT M. AHERN, both of Chicago, for appellees Balmoral Jockey Club, Inc., Balmoral Park Trot, Inc., and Fox Valley Trotting Club, Inc.

CAREY, FILTER & WHITE, of Chicago (EDWARD M. WHITE, of counsel), for appellees Suburban Downs, Inc., and Estate of Thomas Carey.

HOWARD & HOWARD, of Mt. Vernon (G. W. HOWARD III, of counsel), for appellee Egyptian Trotting Association, Inc.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

This appeal questions a judgment of the circuit court of Cook County affirming action taken by the Illinois Racing Board in granting licenses and allotting dates to certain applicants for the 1973 horse racing season. The appeal was taken by the Attorney General, on behalf of the People of the State, under provisions of the Administrative Review Act. (Ill. Rev. Stat. 1971, ch. 110, par. 264 *et seq.*) Pursuant to our rule 302(b), we allowed direct appeal. 50 Ill.2d R. 302.

The Illinois Racing Board conducted hearings on applications for racing licenses and dates for the 1973 season, and, at the invitation of the Board, a representative of the Attorney General participated in those proceedings. Testimony was heard from the applicants, other representatives of the horse racing industry, and the public generally, and a number of exhibits were received in

evidence. The voluminous record consists primarily of materials concerning the past and projected performances of the applicants with regard to the quality of racing facilities, revenues to the State generated by pari-mutuel betting, competitive ability, and general soundness of management. Pertinent here is testimony regarding the applications of Balmoral Jockey Club, Inc., for thorough-bred dates and Balmoral Park Trot, Inc., Fox Valley Trotting Club, Inc., and Egyptian Trotting Association, Inc., for harness dates. As to Balmoral Jockey Club and Balmoral Park Trot, it was shown that William S. Miller, former chairman of the Illinois Racing Board, had substantial ownership interests in both entities. Miller owned approximately 66% of the stock of Chicago Harness Racing, Inc., which in turn held 61% of the shares outstanding in Balmoral Jockey Club. In addition, Miller individually owned 7,000 shares or 7% of the outstanding 99,390 shares of stock in Balmoral Jockey Club. Balmoral Jockey Club owned 1,500 shares or a 30% interest in Balmoral Park Trot and was its largest single stockholder. There was evidence that Miller had executed a trust agreement, by which he purportedly divested himself of all control over Chicago Harness Racing and Balmoral Jockey Club until December 31, 1973. Other testimony before the Board established that Miller was, at the time of the application hearings, under indictment in the United States District Court for the Northern District of Illinois on charges of perjury, bribery, mail fraud and income tax evasion, allegedly in connection with certain race track transactions. Also pending in the United States Tax Court was a petition on behalf of Miller and his wife, Catherine, appealing a determination of tax deficiency and penalty by the Internal Revenue Service in the amount of $2,768,644. The alleged deficiency was predicated upon the valuation of shares of stock in certain racing stock transactions in which Miller participated for the calendar year 1967.

In regard to the application of Fox Valley Trotting, it

is undisputed that Frontier Sports Enterprises, Inc., which owns 23,600 of the 189,788 outstanding Fox Valley shares, is wholly owned by Louis Jacobs and his sons and daughters of Buffalo, New York. The Jacobs family owns an additional 22,800 shares of Fox Valley Trotting individually, bringing their interests to approximately 24% of the stock outstanding. It was also shown that the Jacobs family owns and operates the Emprise Corporation, which at the time of these hearings had been recently convicted of conspiracy and interstate transportation in aid of racketeering enterprises following a jury trial in the United States District Court for the Central District of California.

During that portion of the hearings devoted to consideration of the Egyptian Trotting application, it was shown that this applicant did not own any racetrack, but was the lessee of the Washington Park premises for the 1973 season.

At the conclusion of the hearings a majority of the Board voted to grant licenses to certain applicants and allot dates; written findings and orders according with the majority action were thereafter entered. Among the successful applicants were Balmoral Jockey Club, Balmoral Park Trot, Fox Valley Trotting and Egyptian Trotting, and it is the award of licenses and dates to these applicants which is here challenged.

On December 18, 1972, the Attorney General, in his representative capacity for the State, filed a complaint in the circuit court of Cook County seeking: (1) administrative review of the Board's action, (2) a declaratory judgment that such action was improper, and (3) an injunction barring implementation of the racing schedule as awarded. The Board filed as its answer the complete transcript of the hearings; certain of the defendants filed motions to dismiss, alleging *inter alia* that the Attorney General had no standing to institute suit in this cause. All such motions were denied, and by agreement of the parties the case proceeded as to count I, the complaint for

administrative review. The circuit court filed a written opinion and subsequently entered an order affirming the action of the Board as: (1) not against the manifest weight of the evidence; (2) supported by substantial evidence; (3) not arbitrary, unconscionable, or capricious; and (4) not contrary to the statutes.

Since the People, on the relation of the Attorney General, are the sole appellant, and the objection to the right of the Attorney General to take this appeal is also urged here, it is that question which must be first considered. The Administrative Review Act provides:

> "Every action to review a final administrative decision shall be commenced by the filing of a complaint and the issuance of summons within 35 days from the date that a copy of the decision sought to be reviewed was served upon *the party affected thereby.*" (Emphasis added.) Ill. Rev. Stat. 1971, ch. 110, par. 267.

> "Unless review is sought of an administrative decision within the time and in the manner herein provided, *the parties to the proceeding* before the administrative agency shall be barred from obtaining judicial review of such administrative decision." (Emphasis added.) Ill. Rev. Stat. 1971, ch. 110, par. 265.

Thus the issue becomes whether the Attorney General was a party to the proceedings before the Illinois Racing Board in the sense in which that phrase is used in the statute, and whether he, in his representative capacity for the State, was adversely affected by the order propounded. In support of that standing, appellant invites our attention to statutory language to be found in section 3.3 of the Horse Racing Act (Ill. Rev. Stat. 1971, ch. 8, par. 37c—4), which provides that the Attorney General shall "assist and participate" in certain hearings at the invitation of the Board; he also notes that the "appearance" of the Attorney General is recorded with that of other parties in transcripts and other materials now before us. While we acknowledge the appellant's participation in the licensing hearings, we believe more persuasive grounds exist for

upholding his right to invoke the provisions of the Administrative Review Act and to appeal an adverse decision thereunder. In fact, the plaintiff's examination of witnesses before the Board and independent introduction of evidence is entirely consonant with his role as attorney and counselor to the Illinois Racing Board, a public entity appropriately advised by the Attorney General (see Ill. Rev. Stat. 1971, ch. 14, par. 4), and does not necessarily connote the status of an independent participant. We conclude that his relationship to the Board was a multi-faceted one, reflecting the Attorney General's unique involvement with the conduct of horse racing in Illinois.

Certain of the Attorney General's statutory duties are clear: he is specifically authorized to enforce the provisions of the Horse Racing Act, and shall assist the Board at its invitation during certain hearings under both the Horse Racing Act and the Harness Racing Act. (Ill. Rev. Stat. 1971, ch. 8, pars. 37c–4, 37g, 37s.16c.) In addition, the Attorney General is concerned, by common law and statute, with impairment of State revenues, diminution of public charities, and misconduct of public officers. (See generally *Fergus v. Russel (1915), 270 Ill. 304;* Annot. (1922), 19 A.L.R. 1382; Annot. (1946), 163 A.L.R. 1346.)

"*** The prerogatives which pertained to the Crown of England under the common law, in this country are vested in the people and the necessity for the existence of a public officer charged with the protection of public rights and the enforcement of public duties, by proper proceedings in the courts of justice, is just as imperative here as there.

In this State the constitution, by creating the office of Attorney General under its well-known common law designation and providing that he shall perform such duties as may be prescribed by law, ingrafted upon the office all the powers and duties of an Attorney General as known at the

common law, and gave the General Assembly power to confer additional powers and impose additional duties upon him." *People ex rel. Barrett v. Finnegan (1941), 378 Ill. 387, 392-3.*

A primary legislative purpose in the regulation of horse racing is the generation of income for the State; the Harness Racing Act specifically designates "the highest prospective total revenue to be derived by the State" as a factor to be considered by the Board in allocating racing dates. (Ill. Rev. Stat. 1971, ch. 8, par. 37s.10.) Similarly, provision is made for the award of racing dates whose proceeds, after taxes and operating expenses, are to be given over for charitable works. (Ill. Rev. Stat. 1971, ch. 8, pars. 37b, 37s.10.) The strong public interest in maximizing both revenue to the State and to public charities is apparent, as is the necessity of requiring strict observance by public officials of the statutory scheme in furtherance of these objectives. That necessity, which reflects the public interest in maintaining the integrity of certain types of public activities, including the pari-mutuel betting present here, which are peculiarly susceptible to subversive influences, permits the Attorney General to initiate the judicial review of the Racing Board action here sought, for the nature of that activity requires the special vigilance of the Attorney General as well as that of those executive agencies charged with its regulation. We conclude, therefore, that the Attorney General could properly initiate this judicial review.

We turn now to specific challenges to the awards made by the Board to Balmoral Jockey Club, Balmoral Park Trot, Fox Valley Trotting and Egyptian Trotting. As to the first two applicants, which are in part owned by William S. Miller, the racing licenses and dates allotted were clearly granted contrary to the statutes. The Horse Racing Act as amended provides in pertinent part:

"*** nor shall any license be issued to any person, association, corporation or trust who shall be deemed by

said Board not of sufficient financial integrity and moral responsibility to hold a horse racing meeting conducive to the interests of legitimate racing". Ill. Rev. Stat. 1971, ch. 8, par. 37c.

"The term 'person' as used in this Act shall include any individual and all members or legal or beneficial interest holders in any association, partnership, corporation, trust or any other entity or body politic or corporate." (Ill. Rev. Stat., 1972 Supp., ch. 8, par. 37a1a.) Pub. Act 77—1997, sec. 1a, amending Horse Racing Act, Ill. Rev. Stat. 1971, ch. 8, par. 37a1a.

Parallel provisions of the Harness Racing Act provide:

"No licenses may be granted to conduct a harness racing meet:

\* \* \*

(e) To any person that has been convicted of the violation of any law of the United States or any State law, which law provided, as all or part of its penalty, imprisonment in any penal institution; to any person against whom there is pending any state or federal criminal charge; to any person who is or has been connected with or engaged in the operation of any illegal business; to any person who does not enjoy a general reputation in his community of being an honest, upright, law abiding person." (Ill. Rev. Stat., 1972 Supp., ch. 8, par. 37s.7.) Pub. Act 77—1996, sec. 1, amending Harness Racing Act, Ill. Rev. Stat. 1971, ch. 8, par. 37s.7.

"In this Act:

\* \* \*

(c) 'Person' means any individual and all members or legal or beneficial interest holders in any association, partnership, corporation, trust or any other body politic or corporate." Ill. Rev. Stat., 1972 Supp., ch. 8, par. 37s.

We agree with the appellant's contention that the Horse Racing Act and the Harness Racing Act are to be construed *in pari materia*. Both Acts are part of a comprehensive statutory plan for the regulation of the horse racing industry in Illinois and their provisions should be viewed as integral parts of a whole. To this end the legislature abolished the Illinois Harness Racing Commission in 1965 and entrusted the regulation of all racing to a

unified Illinois Racing Board. (Laws of 1965, p. 1346.) It would seem unlikely that different standards of integrity were intended to govern elements of the same industry. Thus the enumeration in section 8(e) of the Harness Racing Act represents a partial legislative specification of insufficient financial integrity and moral responsibility as envisioned in the companion provision of the Horse Racing Act, section 3. This being so, William S. Miller is clearly disqualified from receiving a racing license under the mandatory language of the statute. The efficacy of the purported "trust" is immaterial in view of the amended definition of "person" under both acts, as is the issue, discussed in the trial court and in the briefs before us, of the presence and degree of control and management over the applicants, which Miller exercised. Miller's holdings in the two entities were substantial, and where such ownership is not *de minimis,* the statute contemplates only "legal and beneficial interest" and not the exercise of control. In reaching this conclusion we are not unaware that serious constitutional problems could be posed by the statute's summary disqualification of an applicant because of the pendency of some minor criminal charge against a single stockholder owning only one of many shares. Those problems which may arise in a future case simply are not present here.

With respect to the racing license granted to Fox Valley Trotting, we note that the dates awarded commenced on March 1, 1973, and were concluded on April 16, 1973, during the pendency of this litigation. For that reason, the appeal from the Board's order granting forty days of racing to the Fox Valley Trotting Association has become moot and we make no determination relative to that aspect of the case.

With regard to the license and date allocation for Egyptian Trotting we do not agree with appellant's assertion that because the applicant owns no racetrack, "it

surely cannot qualify as an applicant having financial integrity and moral responsibility." Egyptian does have an existing and apparently valid lease of the Washington Park track, as earlier noted herein. Section 8(f) of the Harness Racing Act prohibits the award of a racing license:

> "To any person who does not at the time of application for the license possess, *or have a contract or lease for the possession of,* on the dates of the proposed meet, a finished race track suitable for harness racing and for the accommodation of the public." (Emphasis added.) Ill. Rev. Stat. 1971, ch. 8, par. 37s.7.

Since the legislature itself has permitted applications from those who possess a leasehold interest in a race course rather than outright ownership, plaintiff's suggestion that absence of ownership, without more, should be the basis for disqualification from receiving a license is untenable. We find nothing establishing the Board's award of a license and dates to Egyptian to be contrary to the manifest weight of the evidence.

Accordingly, the judgment of the circuit court of Cook County is reversed as to Balmoral Jockey Club, Inc. and Balmoral Park Trot, Inc., and the cause is remanded to the Illinois Racing Board for proceedings consistent with this opinion. The judgment as to Egyptian Trotting Association, Inc., is affirmed.

*Affirmed in part;*
*reversed and remanded in part.*

MR. JUSTICE SCHAEFER took no part in the consideration or decision of this case.