DALE E. VAN WINKLE, Petitioner-Appellee, *v.* THE DEPARTMENT OF LAW ENFORCEMENT *et al.*, Respondents-Appellants.

Fourth District    No. 4—82—0811

Opinion filed June 13, 1983.—Rehearing denied July 8, 1983.

Neil F. Hartigan, Attorney General, of Springfield (Frederic D. Tannenbaum, Assistant Attorney General, of counsel), for appellants.

Edward G. Coleman, of Springfield, for appellee.

PRESIDING JUSTICE WEBBER delivered the opinion of the court:

Petitioner Van Winkle, a State trooper, was given a disciplinary suspension of 12 days by the Superintendent of the State Police for violation of certain rules and regulations of that organization regarding secondary employment. He petitioned the Department of Law Enforcement Merit Board (Merit Board) for review of that decision. A hearing officer for that board conducted an evidentiary proceeding, following which he was issued findings of fact and conclusions of law which essentially affirmed the superintendent's action. The Merit Board adopted the hearing officer's report. Van Winkle then obtained from the circuit court of Sangamon County a common law writ of *certiorari* to review the Merit Board's decision. That court, by docket entry, found the decision to be arbitrary and capricious and reversed. The Department of Law Enforcement appeals.

It appears that for several years prior to the case at bar, at least as far back as 1971, the Department of Law Enforcement, Division of State Police (Department), had regulations governing secondary employment of State police officers. Such employment was not prohib-

ited, but prior approval of the appropriate officials of the Department was required. These regulations, as issued and superseded from time to time, contained restrictions. The latest ones, dated October 1, 1978, and designated in the record as "PER 4," are at issue here. PER 4, like its predecessors, required prior approval of secondary employment and contained the following as paragraph 4-5:

"*NON-ACCEPTABLE SECONDARY EMPLOYMENT*

Officers will not engage in secondary employment which is in violation of Department rules, or which:

(a) If performed would create an appearance of impropriety or reflect unfavorably upon the officer or the Department.

(b) Would involve the employee in a conflict of interest.

(c) Would require collecting obligatory, delinquent or arrearage accounts of any kind.

(d) Would involve employment in a tavern or other establishment where the primary business is the sale of liquor.

(e) Because of exhaustive physical or mental activity, would impair employee efficiency or capability to carry out official assignment of duties.

(f) Would involve any activity in connection with bail bond agencies.

(g) Would involve operation of any motor carrier which would make the employee unavailable during emergency situations."

The stipulated facts and the evidence before the hearing officer reveal that Van Winkle in 1972 received approval for "Ownership of Standard Bred Horses for Racing purposes at non-wagering County and State Fairs." The approval was renewed in 1973. In 1974 it was rescinded for reasons not pertinent here. In 1975 approval was given for "Owner-trainer-driver of standard bred race horses." This included "fairs as well as parimutuel tracks." From 1975 to 1978 apparently no renewal was required; only that the superiors be notified of the secondary employment.

On March 15, 1979, Van Winkle, pursuant to the provisions of PER 4, paragraph 4-3, requested permission "to engage in standard bred harness racing beginning 4-15-79 at Quad City Downs in East Moline Ill. I would be self-employed serving in the capacity as an owner, trainer and driver." The Superintendent of the Department replied as follows:

"This is to advise that Trooper Dale E. VanWinkle's request for secondary employment authorization to engage in standard breed harness racing as the owner, trainer, and driver is denied. My denial of Trooper VanWinkle's request is based on the

fact that his employment as a member of the Department of Law Enforcement places him in a potential conflict of interest. The Illinois Revised Statutes, Chapter 127, Section 55 a 14, requires the Department of Law Enforcement to provide investigative services under the Horse Racing Act. Section 37—34 requires the Department of Law Enforcement to enforce the racing statutes. Therefore, Trooper VanWinkle, as a sworn member of the Department of Law Enforcement, is required to enforce the laws which affect him as a trainer or driver and would place him in a position to use his influence as a State Police Officer in an undue fashion. I believe this potential sufficiently warrants my denial of Trooper VanWinkle's active participation as a trainer and/or driver at parimutuel tracks or the State Fair. Although Trooper VanWinkle is prohibited from actively engaging in the training or driving of horses at the aforementioned tracks, it does not affect his ownership of horses."

Three aspects of this document are to be carefully noted: (1) in the first sentence approval is denied to engage in harness racing "as the owner, trainer and driver"; (2) in the last sentence the trooper is prohibited from "training and driving" horses but the directive "does not affect his ownership of horses"; and (3) the emphasis is placed upon "potential conflict of interest."

Van Winkle, apparently for reasons afterwards urged on appeal to the Merit Board, became persuaded that the superintendent's disapproval was a nullity, but no means appeared feasible for testing the validity of the denial. He therefore, on his own motion, elected to disobey the directive by driving his horse at Quad City Downs on April 12, 18, 25, May 2, 9, 16, 25, and June 2, 1979. The upshot of this was that Van Winkle was called before the Professional Standard Review Board to determine whether discipline was warranted. It is represented by counsel in the record that this board is an internal, nonstatutory body within the State police organization. It is apparently used by the superintendent in an advisory capacity on matters of discipline. Troopers are not furnished with a copy of any charges, not allowed counsel, and no record of the proceedings is made.

According to Van Winkle's testimony before the hearing officer of the Merit Board, his interview with the Professional Standard Review Board was largely concerned with whether he had disobeyed an order of his superior. There was apparently no concern with improper or illegal conduct by him in connection with horse racing. He maintained at that interview that no conflict of interest existed.

Nonetheless, the superintendent on August 3, 1979, issued a document entitled "Official Disciplinary Action" and addressed to Van Winkle. It ordered a 12-day suspension and assigned as reasons therefor the violation of certain rules and regulations. The pertinent part of the document states:

"1. PER 4, Paragraph 3, in that you actively engaged in your secondary employment after your application for permission to engage in such employment was denied by the Superintendent of the Division of State Police.

2. ROC-1, Paragraph 1-3, in that on April 12, April 18, April 25, May 3, May 9, May 16, May 25, and June 2, you drove a race horse in races at Quad City Downs Race Track in direct violation of PER 4, Paragraph 3, which requires officers to not engage in secondary employment until receiving written approval from their Deputy Director/Superintendent, which request of yours had been denied by the Superintendent of State Police on or about April 11, 1979.

3. DSP, ORG 14, Paragraph 14-3 (B), in that you failed to comply with the above stated rules and regulations of the Department of Law Enforcement as established by the Director, in violation of this order of the Superintendent of the Division of State Police."

We are advised that "PER" indicates "Personnel Rule"; that "ROC" indicates "Rules of Conduct"; and that "ORG" indicates "Organizational Rule." The various ones referred to in the superintendent's disciplinary order are incorporated in the record. PER 4 has been discussed above; ROC-1, paragraph 1-3, deals with compliance with authority and provides that officers will do nothing which would constitute a violation of any departmental rule, regulation, directive, order, or policy. ORG 14, paragraph 14-3(b), deals with responsibilities of officers and provides that they will comply with rules and regulations established by the Director of the Department of Law Enforcement and the superintendent.

On September 5, 1979, Van Winkle petitioned the Merit Board for review. He alleged that PER 4, paragraph 4-3, was unconstitutional because it failed to set forth any standards by which an applicant might determine whether his request for permission to engage in secondary employment would be approved or disapproved; that ROC-1, paragraph 1-3 was unlawful; and that there was no evidence that he was guilty of disobeying any lawful rule or regulation. At the hearing before the hearing officer of the Merit Board, all of the operative facts, as set forth above, were agreed to by stipulation. In addition,

Van Winkle testified that he had no duty to enforce the Illinois Horse Racing Act; that therefore no conflict existed; that there was no substantive difference in race track activities as among owners, drivers, and trainers. He also testified that there is no method of appealing the superintendent's denial of a request for permission to engage in secondary employment.

He also presented another trooper as his witness who testified that he had no duties in the enforcement of the Illinois Horse Racing Act, and that the Division of Criminal Investigation, another of the five divisions of the Department of Law Enforcement, is responsible for that statute. On cross-examination he stated that the personnel of the Division of State Police and the Division of Criminal Investigation do not "intermix." He stated that State troopers can be assigned to traffic detail at race tracks and that officers can be transferred from one division to another within the Department of Law Enforcement.

The hearing officer's findings of fact and conclusions of law affirmed the superintendent's denial. He found that nothing in the record supported the proposition that the superintendent's action was arbitrary or capricious and that the denial was based upon a potential conflict of interest. He did not discuss Van Winkle's situation with reference to nonacceptable secondary employment, set forth in PER 4, paragraph 4-5 and recited verbatim above. The Merit Board adopted his findings and conclusions.

The trial court's order consists only of a brief docket entry finding that the action of the superintendent was arbitrary and capricious and reversing. However, the court's thinking is delineated in a letter to counsel which is in the record. In it the court states that the denial was ostensibly made under subparagraph (b) of PER 4 concerning conflict of interest. The court opined that subparagraph (a) concerning the appearance of impropriety might have formed a more secure basis. The court also touched upon what we consider the real basis for the disposition of this case: the irrationality of the superintendent's denial. In the first sentence he forbids engaging in secondary employment as an owner of race horses, but in the last sentence he permits it. Given this kind of an order, we fail to see how any of the subparagraphs of PER 4 relating to nonacceptable secondary employment can have application.

The parties have briefed and argued a variety of matters which we find unhelpful and irrelevant to the central fact of the inconsistency and irrationality of the superintendent's order. Curiously, this matter was not considered by the Merit Board and only peripherally by the trial court. Questions as to what may or may not be a potential

conflict of interest; what duties the Division of State Police, Department of Law Enforcement, may or may not have concerning horse racing; what other grounds there may be for upholding the superintendent's and the Merit Board's action; what is an actual versus a potential conflict of interest; all these become insignificant. What remains is an order which is arbitrary and capricious on its face because of its inconsistencies and no means provided for the trooper to contest it except by deliberate violation.

We have no reservations about the superintendent's concern with horse racing. The evils attendant upon that sport are well known and have been commented upon unfavorably by the courts. (See *People ex rel. Scott v. Illinois Racing Board* (1973), 54 Ill. 2d 569, 301 N.E.2d 285; *Kurtzworth v. Illinois Racing Board* (1981), 92 Ill. App. 3d 564, 415 N.E.2d 1290.) However, serious matters deserve serious consideration, and the denial order does not reflect this. It is an order which was impossible to obey.

We note that section 15(a) of the Illinois Horse Racing Act of 1975 (Ill. Rev. Stat. 1981, ch. 8, par. 37—15(a)) makes no distinction among owners, trainers, harness drivers, and others. All shall be licensed by Illinois Racing Board in its discretion. If the superintendent felt that horse racing would create either an appearance of impropriety or a conflict of interest, logic demands that all connection with it, whether as owner, trainer, driver, or other capacity set forth in section 15(a) be prohibited. Thus the semantic debate of the parties in their briefs over the grammatical distinction between "would" and "could" becomes meaningless. Compare *People v. Malloy* (1980), 83 Ill. App. 3d 344, 403 N.E.2d 1221.

The order of the circuit court of Sangamon County is affirmed.

Affirmed.

MILLS and GREEN, JJ., concur.