627 P.2d 666

STATE of Arizona ex rel. John A. LA
SOTA, Jr., The Attorney
General, Appellant,

v.

ARIZONA LICENSED BEVERAGE AS-
SOCIATION, INC., an Arizona Corpora-
tion; Paul H. Klett; John N. Gannis;
George Jacob; Mike Jacob; Louis Pou-
los; Al Kaufman; and Diamond Publi-
cations Inc., an Arizona Corporation,
Appellees.

No. 14692.

Supreme Court of Arizona,
In Division.

March 11, 1981.

Rehearing Denied May 5, 1981.

John A. LaSota, Jr., Former Atty. Gen. by Anthony B. Ching and John A. Baade, Asst. Attys. Gen., Robert K. Corbin, Atty. Gen. by Alison B. Swan, Chief Counsel, Antitrust Division, Kenneth R. Reed, Sp. Asst. Atty. Gen., Phoenix for appellant.

Goldstein, Flynn & Mason, by Philip T. Goldstein, Thomas C. Mason, Pamela L.

Kingsley, Phoenix, for appellees Arizona Licensed Beverage Ass'n, Paul H. Klett, John N. Gannis, George Jacob, Mike Jacob, Louis Poulos, Al Kaufman.

Powers, Ehrenreich, Boutell & Kurn, by James Powers, Phoenix, for appellee Diamond Publications, Inc.

CAMERON, Justice.

This is an appeal by the State from a judgment of dismissal in an action for price fixing in violation of the Uniform State Antitrust Act, A.R.S. § 44–1401 et seq. We have jurisdiction pursuant to Rule 19(e), Rules of Civil Appellate Procedure, 17A A.R.S.

The issues we must resolve are:

1. Does the Arizona Uniform State Antitrust Act apply to the conduct of the defendants in this case?

2. Did the trial court make clearly erroneous findings of fact?

3. Did the trial court make evidentiary rulings which constituted prejudicial error?

4. Was the conduct of the Arizona Licensed Beverage Association and the individually named defendants lawful under the Arizona Fair Trade Practices Act?

5. Did Diamond Publications, Inc., by accepting and placing advertisements in the Arizona Beverage Journal containing price lists of alcoholic beverages, become part of an illegal price fixing conspiracy?

The pertinent facts are as follows. Defendant Arizona Licensed Beverage Association (ALBA) is a non-profit trade association of liquor retailers in the state. The organization, which has been in existence for over 30 years, meets approximately four times a year and has a membership of about 1500 retailers. Topics of discussion at the meetings have been legislation, fair trade agreements with various liquor distillers and distributors, profit margins on products, reports on trade shows, fund raising projects, and insurance programs available to members.

Defendant Diamond Publications, Inc., publishes the Arizona Beverage Journal which is considered the trade journal for the liquor industry in Arizona. Until 1976, the Journal published price lists for many of the alcoholic beverages sold in Arizona. The price lists contained three columns of figures; the first column was the wholesale price per case of a particular brand of liquor, the second column contained the wholesale price per bottle, and the third column, designated as the "minimum stop price," was the minimum retail price to be charged per bottle pursuant to fair trade agreements. Distillers and distributors purchased the space containing the price lists as part of their advertising and determined all of the prices listed.

On 3 December 1975, the Attorney General instituted this action for violations of the Uniform State Antitrust Act which had been adopted in Arizona effective 9 August 1974. The complaint alleged that the defendants engaged in a conspiracy to fix, maintain and stabilize prices for alcoholic beverages in Arizona from a time prior to 1966 to December 1975.

The action was tried before Judge Marilyn A. Riddel, sitting without a jury, in the Maricopa County Superior Court. At the close of the State's case, the court dismissed the complaint and entered the following findings of fact and conclusions of law pursuant to Rules 41(b) and 52(a), Arizona Rules of Civil Procedure, 16 A.R.S.:

"1. The statute under which plaintiff got its authority to institute the within action became effective August 9, 1974.

"2. Suit was filed December 3, 1975 and no supplemental complaint has been filed.

"3. The Arizona Fair Trade Act was in effect at all times material hereto (covering the entire period of the testimony adduced) and was not repealed until June 1, 1976.

"4. For many, many years previous to suit the minimum stop price (minimum retail price) published in the Arizona Beverage Journal was treated both by custom and by usage, by all concerned as the 'fair trade price' for the item advertised,

to wit: the price for which that item was to be sold at retail. Said prices were published at the instance and behest of the individual wholesalers acting individually and were published in lieu of delivering an individual retail price list with each delivery by a wholesaler to a retailer as had previously been tried with somewhat unsatisfactory results.

"5. The minimum stop price was established monthly by the individual wholesaler without any consultation with or input from any retailer or any other wholesaler.

"6. On one occasion in 1971 Hyman and Kaufman [defendants] went to Copperstate [distributor] to solicit a fair trade contract as to that distributor's products; however, all of the 'fair trade contracts' in evidence were signed by the retailers at the specific request of the individual wholesalers.

"7. There was no economic or other coersion [coercion] exercised to compel retail price maintenance and no boycott of any kind for that purpose.

"8. Over the years (particularly to August 9, 1974) the subject of the Arizona Fair Trade Act, fair trade contracts, profit margins and related subjects were discussed at ALBA meetings and between individual retailers. Occasionally a retailer would contact a wholesaler to report that another business was not adhering to the minimum stop price, both before and shortly after August 9, 1974.

"Based upon the foregoing findings and the state of the law in the State of Arizona between August 9, 1974 and December 3, (and probably through May 31, 1976), the state has not proved that defendant (or any of them) did anything which the law prohibited them from doing as alleged in the complaint."

Judgment was entered in favor of Diamond Publications, Inc., on 10 January 1978 and in favor of the remaining defendants on 14 February 1978.

The State's motion to vacate judgments, for a new trial and to amend and make additional findings of fact were denied and this appeal followed.

## DOES THE ANTITRUST ACT APPLY?

■ The Arizona Fair Trade Practices Act, A.R.S. § 44–1421 et seq., was adopted in Arizona in 1936 and was in force and effect during the time covered by the complaint. The act states:

"§ 44–1422. Provisions permitted in contracts related to sale or resale of fair trade commodities; fair trade commodities defined; implied exceptions to contract provisions

"A. No contract relating to the sale or resale of a commodity which bears the trade-mark, brand or name of the producer or owner of the commodity, or the label or container of which bears such trade-mark, brand or name, and which is in fair and open competition with commodities of the same general class produced by others shall be deemed to violate any law of the state by reason of any of the following provisions which may be contained in the contract:

1. That the buyer will not resell such commodity except at the price stipulated by the vendor.

2. That the vendee or producer require in delivery to whom he may resell such commodity to agree that he will not, in turn, resell except at the price stipulated by such vendor or by such vendee.

\*    \*    \*    \*    \*    \*

"§ 44–1423. Advertising or sale of commodity at less than agreed price as unfair competition; right of person damaged to maintain action

"Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the "price stipulated in any contract entered into pursuant to the provisions of § 44–1422, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition upon which an action may be brought by any person damaged thereby.

"§ 44–1424. Inapplicability of article to contracts between producers, wholesalers or retailers

"This article shall not apply to any contract or agreement between producers or between wholesalers or between retailers as to sale or resale prices."

The purpose of fair trade legislation was stated by the United States Supreme Court:

"It [fair trade act] proceeds upon the theory that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes what the statute denominates 'unfair competition.'

\* \* \* \* \* \*

"There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the good will and business of the producer and distributor of identified goods, but injurious to the public as well." *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.*, 299 U.S. 183, 195, 57 S.Ct. 139, 145, 81 L.Ed. 109, 120 (1936).

An obstacle to state fair trade statutes was the prohibition against agreements in restraint of trade under the Sherman Act, 15 U.S.C. § 1. The United States Supreme Court had determined that contracts between manufacturers and resellers which set a minimum resale price restrained trade. *Dr. Miles Medical Co. v. John D. Park & Sons*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). The Sherman Act was amended in 1937 to allow fair trade contracts if they were permissible under state law. Act of August 17, 1937, ch. 690, Title VIII, 50 Stat. 693 (Miller-Tydings Act). This court has upheld the constitutionality of the Arizona Fair Trade Practices Act and allowed either a producer or competing seller to bring an action against persons who advertised or sold fair traded commodities at prices below those stipulated by the producer or wholesaler of the commodity. E. g. *Everybody's Drug Company v. Duckworth*, 84 Ariz. 141, 325 P.2d 400 (1958); *General Electric Company v. Teleco Supply, Inc.*, 84 Ariz. 132, 325 P.2d 294 (1958); *House of Seagram, Inc. v. Marco Supermarkets, Inc.*, 6 Ariz. App. 83, 430 P.2d 429 (1967).

In December 1975, the Miller-Tydings Act exempting state fair trade acts from federal antitrust laws was repealed, and the Arizona Fair Trade Practices Act was repealed as of June 1976. Consumer Goods Pricing Act of 1975, Pub.L.No. 94–145, § 2, 89 Stat. 801. The Arizona Fair Trade Practices Act, however, was in effect at the time this suit was brought.

The Arizona Uniform State Antitrust Act, A.R.S. § 44–1401 et seq., is similar in language to the Sherman Act and is in conflict with the Arizona Fair Trade Practices Act. A.R.S. § 44–1421 et seq. Where two acts are in conflict, we will read them together and harmonize them if possible, and:

"\* \* \* In so far as the provisions of a special statute are inconsistent with those of a general statute on the same subject, the special statute will control." *Desert Waters, Inc. v. Superior Court*, 91 Ariz. 163, 171, 370 P.2d 652, 657 (1962).

Arizona's fair trade act specifically authorized fair trade agreements, while the antitrust act generally prohibited any attempt at price fixing. Reading the acts together, we believe it was the legislative intent to allow agreements authorized by the fair trade act as an exception to the antitrust prohibitions banned by the antitrust legislation.

It should be noted, however, that the Arizona Fair Trade Practices Act, while authorizing the setting of prices by contract between manufacturers and retailers, does not allow price fixing among retailers. The State in this case had the burden of proving a "horizontal" conspiracy by retailers to fix retail prices, contrary to the Fair Trade Practices Act and the Uniform Antitrust Act.

## ERRONEOUS FINDINGS

The State challenges specifically three findings of fact made by the trial court, Findings Four, Five and Seven. Unless clearly erroneous, the findings of fact of the trial court will not be set aside on appeal. *Isaak v. Massachusetts Indemnity Life Insurance Company*, Ariz., 623 P.2d 11 (1981); Rule 52(a), supra.

a. Finding Number Four:

"4. For many, many years previous to suit the minimum stop price (minimum retail price) published in the Arizona Beverage Journal was treated both by custom and usage, by all concerned as the 'fair trade price' for which that item was to be sold at retail * * *."

■ The State challenges this finding as an incorrect conclusion of law because the trial court did not first make a finding that the commodities involved here were in free and open competition with other commodities of the same general class. A.R.S. § 44–1422(A). We do not agree.

In any given retail liquor store, several brands of the same type of alcohol are sold. An examination of the exhibits of price lists contained in the Journal shows that different brands of the same product, i. e. vodka, whiskey, etc., had different prices. The brands of liquor which were subject to fair trade contracts in this case were in competition with other brands.

While it is true that the Fair Trade Practices Act required that a product be in open competition before it could be the subject of a fair trade agreement, we have never held that the trial court must make a special finding to this effect before it could find that a product was fair traded. E. g. *Skaggs Drug Center, Inc. v. United States Time Corp.*, 101 Ariz. 392, 420 P.2d 177 (1966); *Everybody's Drug Company v. Duckworth*, supra; *General Electric Company v. Telco Supply, Inc.*, supra. We find no error.

b. Finding Number Five:

"5. The minimum stop price was established monthly by the wholesaler without any consultation with or input from any retailer or any other wholesaler."

■ The State contends that the defendants participated in the setting of the fair trade prices.

Four representatives of either distillers or distributors testified. Charles Hutchins, with Brown-Forman Distillers, stated that he determined the retail price and forwarded it to his wholesaler who then had it

published in the Journal. Burton Humphrey with Buxton-Smith Mercantile Company, a distributor, confirmed that he sent letters to retailers when the prices of beers were increased and that the company sent their prices to the Journal. Lyn Geyer, also with Brown-Forman Distillers, explained that his company computed retail prices and mark-ups. The testimony of these witnesses is consistent with that of Sylvia Diamond that the prices listed in the Journal were determined and provided by producers and wholesalers without input from retailers. We find no error.

c. Finding Number Seven:

"7. There was no economic or other coersion [coercion] exercised to compel retail price maintenance and no boycott of any kind for that purpose."

The State claims the solicitation of price maintenance agreements by members of ALBA was a conspiracy to fix prices and profit margins. In 1972, several members invited the representatives from Brown-Forman Distillers to a luncheon meeting at the Rodeway Inn in Phoenix. Cactus Beverage Company distributed Brown-Forman products in Arizona. Allegedly, the defendants solicited fair trade agreements and threatened to remove the products of Brown-Forman from their shelves if agreements were not entered. Although Lyn Geyer, a representative from Brown-Forman Distillers testified that some of the defendants had threatened to remove Early Times from their shelves unless they entered into a fair trade agreement and Cactus Beverage Distributing Company later did enter into a fair trade agreement, Paul Walton, the representative of Cactus, stated:

"Q At any time prior to February 6th, 1973, did Mr. Jacob ever threaten you or attempt to coerce you into signing that instrument [fair trade contract]?

"A No."

When questioned about the other ALBA members who were present at the Rodeway Inn, Mr. Walton responded in the same manner:

"Q So, therefore, on the basis of your answers Cactus Beverage Distributing Company of Arizona, Inc. entered * * * [fair trade contracts] voluntarily and as a matter of its independent judgment and decision; isn't that correct?

"A That is correct."

■ The State relies on the testimony of Lyn Geyer relating to a meeting at the Rodeway Inn in which it is alleged that retailers compelled Cactus Beverage Distributing Company to sign a fair trade agreement. The testimony of Paul Walton, the representative for Cactus Beverage, contradicted Geyer. The trial judge has authority to reject the testimony of an interested witness and to determine credibility. *United Bank v. Mesa N. O. Nelson Co.*, 121 Ariz. 438, 590 P.2d 1384 (1979); *Stewart v. Lee-Stewart, Inc.*, 5 Ariz.App. 216, 425 P.2d 118 (1967). There was sufficient evidence through Walton's testimony that Cactus Beverage signed the fair trade contracts voluntarily.

Further evidence of coercion was alleged in the actions of ALBA members when they told Geyer and Walton that they would remove Early Times from their shelves if fair trade agreements were not arranged. However, only one witness, Marvin Hyman, testified that he had removed Early Times and that was because a retail chain store in Tucson was advertising Early Times at a price below the fair trade price listed in the Journal:

"Q At the Rodeway Inn meeting, was there any mention of your removing Cactus Beverage products from your shelves?

"A [Mr. Hyman] I believe there was.

"Q And, what did you say about the fact that Cactus beverage products were being removed from your ˙ shelves?

* * * * * *

"A * * * I said, 'I will not carry a product that is advertised for less than I will keep in my store.'

"Q Did anybody else at that meeting indicate whether they were removing Cactus Beverage products from their shelves?

"A No."

It appears that Mr. Hyman made an independent business decision to not display Early Times, and that a group boycott or concerted action on behalf of ALBA was not agreed upon or undertaken.

The State also contends that one distiller was forced to raise his price as the result of pressure by the retailers. The facts are that the Arizona legislature increased the liquor tax effective 1 July 1974. Brown-Forman Distillers did not calculate the tax increase into the retail price of Early Times Whiskey, resulting in a decrease in the profit margin of Early Times of 2% on the fair traded price. Several retailers complained to the representative of Brown-Forman about the decrease in profit margin for Early Times. A representative of the distiller testified:

"* * * Mr. Geyer, your predecessor had made a mistake with the Early Times?

"A That's true.

"Q * * * The nature of that mistake was when the distilled tax came in July 1st you forgot to suggest a price raise, isn't that true?

"A Took a price cut."

The action of the retailers in discussing the matter was simply to point out to the distillers that a mistake had been made in the fair trade retail price. The fact that the distiller recognized the mistake and increased the price to reflect the tax increase does not mean that the defendants conspired to raise the price of Early Times.

The State further contends there was pressure placed on other retailers to stop price cutting. On one occasion, two of the defendants, along with two other members of ALBA, visited Jack Tillotson and asked him to raise his prices to the prices listed in the Journal. He refused. Within two or three days, several wholesalers called on Tillotson to complain about his prices. Tillotson did not raise his prices, however, and nothing further ensued.

The Fair Trade Practices Act authorized action against price cutters by any person damaged thereby, including a competitor. A.R.S. § 44–1423; *Everybody's Drug Company v. Duckworth*, supra. The defendants were merely doing informally what they had the right to do in court pursuant to statute.

The State also asserts that the conspiracy involved an effort to obtain a 25% profit margin. The profit margin was calculated by using the wholesale and retail prices from the Journal. In 1974, two or three members of ALBA calculated the margin of profit on many brands of alcohol and distributed a profit percentage chart to the members of the association. They used the prices which were stipulated by distillers and distributors and posted in the Journal. Because the record reveals that neither retailers nor the association had any input in determining those prices and that the retail prices were "fair trade" prices, we find nothing unlawful in using a chart to compute for the membership the margin of profit for particular items. This information was valuable to the retailers and could aid them in determining which items to "push" in order to obtain the maximum profit. This maximation of profits was not illegal under the fair trade act.

The State argues, however, that additional proof of agreement among the defendant retailers to maintain a 25% margin of profit was demonstrated by a letter written by Paul Klett, as President of ALBA, to distributors, which reads as follows:

"[ALBA Letterhead]

March 22, 1974

Dear _____:

As you know, during the recent special session of the Arizona Legislature, it was decided to increase the taxes on distilled spirits from $2.00 to $2.50 per gallon, effective July 1, 1974.

Our Association officers and directors request your cooperation when determining the new price schedules necessitated by this tax increase. We hope that all products currently producing a 25% profit for the retailer will continue at this level, and that those products which do not presently produce a 25% profit margin will be increased so that they, too, will reflect such a markup.

Sincerely,

ARIZONA LICENSED BEVERAGE ASSOCIATION

s/ Paul H. Klett, President"

This letter is in the form of a request and strongly suggests that neither individuals nor the association had the power to determine prices nor set margins of profit, but that this responsibility belonged to distillers and distributors which they were allowed to do by law. A.R.S. § 44–1422. While it may be apparent that the retailers would wish the highest amount of profit on each fair traded item, the trial court, after hearing the evidence, did not find that there was an illegal agreement among the retailers to enforce a 25% profit margin. In fact, the evidence indicates that the profit margin varied between 21–24%. That the retailer may be presumed to have desired the 25% profit margin does not show a conspiracy to maintain the 25% price margin.

■ The trial court found that fair trade contracts were signed by the retailers at the request of wholesalers, and that there was no economic coercion exercised to compel retail price maintenance and no boycott for that purpose. We believe Finding Number Seven is reasonably supported by the evidence and not clearly erroneous. *Isaac*, supra. We find no error.

## EVIDENTIARY ERRORS

The State also argues that the trial court's refusal to receive certain evidence resulted in prejudicial error.

a. Deposition of George Jacob

In an unrelated case, *Kosir v. Super City Department Stores*, in the Pima County Superior Court, George Jacob had testified as a witness as to his understanding of a fair trade agreement:

"Q All right. You said a couple of times now that it was—your understanding is the wholesaler doesn't have any-

thing to do with fair trade. What is a fair trade agreement?

"A Well, in my opinion, I thought a fair trade was that everybody kept the same price.

"Q And who is the agreement between?

"A All the retailers, isn't it?

"Q All right. And how do all of the retailers establish the price that is going to be kept?

"A Well, I personally get my price from the journal.

"Q And is it your understanding that the retailers all agree and understand with each other that they will charge the price that's in the beverage journal?

"A Well, that's my understanding and that's why we have the journal, it's very simple to get your price right out of the journal.

\* \* \* \* \* \*

"Q Well, I'd like you to tell me, though, you said that as you understand it, all of the retailers have agreed that they will all charge the price that's in the journal.

"A Yes."

The trial court ruled that the deposition could be used only for impeachment or refreshing recollection.

"The deposition of a party or of any one who at the time of taking the deposition was an officer \* \* \* may be used by an adverse party for any purpose." Rule 32(a)(2), Rules of Civil Procedure, 16 A.R.S.

George Jacob was the Vice President of ALBA at the time his deposition was taken and was a party in the present action. Under the rules of evidence, if the deposition testimony of Jacob was relevant and an admission of a party opponent, it is admissible, even though he was not a party in the prior proceeding. Rules 401, 402 and 801(d)(2), Rules of Evidence, 17A A.R.S. We find no prejudice, however, in the failure to admit the deposition. The Rules of Evidence, supra, state error may not be

predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. Rule 103(a), supra.

The trial judge heard statements which were similar in content to excluded testimony from the deposition. The exclusion of repetitious or cumulative evidence does not require reversal by an appellate court. DeElena v. Southern Pacific Co., 121 Ariz. 563, 592 P.2d 759 (1979); Rule 403, Rules of Evidence, 17A A.R.S. We find no error.

b. Statements by Wholesalers to Jack Tillotson

The State urges that the trial court erred in ruling that Jack Tillotson could not testify about statements made to him by wholesalers when they visited Tillotson's store. The visit was after Tillotson had begun selling beer at prices below the fair trade prices listed in the Journal. The statements were excluded on hearsay grounds, although the State argues that they were statements of co-conspirators made during and in furtherance of a conspiracy and admissible under Rule 801(d)(2)(E), Rules of Evidence, supra.

The State did not allege, nor do the facts indicate, a conspiracy between wholesalers and retailers. The alleged conspiracy is a horizontal conspiracy between retailers. The statements of the wholesalers to Tillotson were not statements of co-conspirators. They were hearsay under Rule 801(c) and were not subject to a hearsay exception under Rules 803 and 804. They were properly excluded.

c. Minutes of the Pima County Retail Licensed Beverage Association

The Pima County Retail Licensed Beverage Association (PCLBA) is a county chapter of ALBA. The State desired to introduce minutes from two meetings of PCLBA because they contained the following statements. "Fair trade committee chairman Mike Jacob gave a report on old business." Mike Jacob gave a report on fair trade. Copperstate (a distributor) is to join Fair Trade." The court excluded the

minutes pending further proof of the relationship between ALBA and the Pima County Association, PCLBA.

We do not believe that the State showed that the minutes were relevant. The defendants are ALBA and its members, not the Pima County chapter, PCLBA. The record contains little evidence of the relationship between the two associations, except that the Pima County Association was a county chapter of ALBA and that dues were paid by members into the state organization and not into county chapters. We are unable to determine whether actions taken at the Pima County Association meetings as reflected in the minutes should be attributable to ALBA. Neither do we find anything in the Fair Trade Practices Act which would prohibit or make unlawful the formation of a fair trade committee. We find no error.

d. Depositions of Walter Swartz and Joseph Schmerl

The court excluded portions of the depositions of two witnesses which were offered in lieu of live testimony, because the State had not noticed these two persons as potential witnesses prior to trial.

Rule 6(a) of the Uniform Rules of Practice of the Superior Court of Arizona, 17A A.R.S., provides that pretrial statements must assert "(1) [t]hat all exhibits and a list of witnesses intended to be used at trial have been exchanged (other than those to be used for impeachment)." The rule further provides "[n]o other exhibits or witnesses shall be used during the trial other than those listed and exchanged, except for good cause shown." The State did not list Walter Swartz and Joseph Schmerl, but tried to introduce their depositions. The trial court excluded the depositions even though the defendant had listed Swartz and Schmerl as witnesses for the defense. We have stated in regard to exhibits not listed nor exchanged pursuant to Rule 6:

" * * * We note also that exhibit 11 was not listed in the pretrial statement nor was it exchanged with opposing counsel prior to trial. Rule 6, Uniform Rules of Practice of the Superior Court, 17A

A.R.S. The failure to comply with the rule was alone sufficient basis for the court to refuse to admit the exhibit." *Norman v. Del Elia*, 111 Ariz. 480, 482, 533 P.2d 537, 539 (1975).

But the State contends that because the defendant had listed Swartz and Schmerl as witnesses, the court erred in not admitting the depositions. The fact that the defendants knew of the two witnesses and listed them as possible witnesses might indicate lack of prejudice had the depositions been admitted. The State may not, however, rely upon the defendants' knowledge and listing of the witnesses as a basis for admitting the State's testimony. The rule (Rule 6), designed to avoid surprises in a civil trial, requires the party (here the State) to list witnesses "intended to be used" at the trial. The State did not indicate it intended to call these two witnesses, and both the defendant and the court were entitled to rely on the absence of the names of two witnesses from the list. We find no error.

## WAS THE CONDUCT LAWFUL?

The State contends that the undisputed evidence shows that the defendant retailers did engage in horizontal price fixing among themselves contrary to the Arizona Fair Trade Practices Act. The State contends that the defendants "unlawfully combined in various subsidiary agreements" to establish and maintain a uniform retail profit margin. Specifically the State contends that the retailers (a) forced one distiller (Brown-Forman) to raise its "stop" price as a result of a tax increase, (b) that they pressured other retailers to raise their prices, (c) they then conspired to have a certain percentage of profit for every item sold, and (d) forced distributors to enter into fair trade contracts.

All of these contentions were disposed of by the court in Finding of Fact Number 7, which found "There was no economic or other coersion [coercion] exercised to compel retail price maintenance and no boycott of any kind for that purpose." The

findings of fact and the judgment that these defendants did not engage in price fixing is supported by the evidence. We find no error.

## DIAMOND PUBLICATIONS, INC.

One of the defendants, Diamond Publications, Inc., was named as a member of the conspiracy apparently for publishing price lists in the Arizona Beverage Journal. Sylvia Diamond was the publisher of the Journal, but neither she nor the Journal were members of ALBA. Although she attended the meetings, she rarely remained for the entire meeting. She stated that she was not present during discussions of price lists, profit margins, or percentage charts and did not attend the business portions of the meetings. Mrs. Diamond testified that any changes in the price list were made by the wholesaler. The uncontradicted evidence shows only that Mrs. Diamond printed what was given to her in the advertisement and is void of any evidence that she or her publication participated in setting prices. The Journal functioned as a trade magazine which was financed through the purchasing of advertising by the people in the trade as is commonplace in many industries.

We question the propriety of naming Diamond Publications as a defendant when it is apparent that there was no evidence of a conspiracy with the other differently situated defendants. Parties should not be hailed into court to stand the expense and embarrassment of trial without there being more than the State was able to or did show in the instant case.

Judgment affirmed.

STRUCKMEYER, C. J., and GORDON, J., concur.