730 P.2d 830

**STATE of Arizona, Appellee,**

v.

**Billy Joe HUDSON, Appellant.**

No. 6730.

Supreme Court of Arizona,
En Banc.

Dec. 31, 1986.

**122**

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Timothy C. Holtzen, Phoenix, for appellee.

Kirby Kongable, Yuma, for appellant.

CAMERON, Justice.

This is an appeal by Billy Joe Hudson from three Yuma County Superior Court verdicts and judgments of guilt: count one, aggravated assault while using a deadly weapon, a class three felony in violation of A.R.S. §§ 13–1204(A)(2), –1203; count two, misconduct involving deadly weapons, to wit, a sawed-off shotgun, a class four felony in violation of A.R.S. §§ 13–3102(A)(3), –3101; and count three, possession of a deadly weapon by a prohibited possessor, a class six felony in violation of A.R.S. § 13–3102(A)(4). All violations were aggravated, dangerous and repetitive pursuant to A.R.S. § 13–604, and were committed while defendant was on parole from a robbery conviction. A.R.S. § 13–604.02(A). Defendant was sentenced to three concurrent life sentences. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, –4035.

The issues that we must determine on appeal are:

1. Did the trial court err in limiting defendant's direct examination of mental health experts as to their opinions only and not allowing testimony about defendant's background, history of mental illness, hospitalization, and other information which appeared in the experts' reports?

2. Did the trial court err in its instruction concerning the unavailability of the insanity defense as the result of voluntary use of alcohol?

3. Did the trial court err in sentencing defendant for felony offenses involving the use or exhibition of a deadly weapon while on parole, without requiring a finding of "dangerousness" by the jury?

4. Is robbery a felony involving violence within the definition of "prohibited possessor" in A.R.S. §§ 13–3102(A)(4), –3101(5)(b)?

## FACTS

On 29 June 1985, defendant's sister, Harriet Clement, was outside her home in

Yuma, Arizona working on an evaporative cooler with her boyfriend, Carlos Asuna. The defendant drove up in his car to Clement's house with his girlfriend, Linda Simpson. When Clement had telephoned defendant earlier in the day, defendant had told her that he would come over to help her work on the cooler. As neither defendant nor Simpson emerged from the car, Clement yelled to them, "Hey, Billy Joe. Come help me." When defendant and Simpson remained in the car, Clement walked over to the car. Asuna, at that time, walked over to Clement's porch and sat down. As Clement approached defendant's car, defendant and Simpson began arguing. Clement reached the driver's window, leaned in and asked, "Hey, what's going on? What's happening?" Defendant then put a sawed off .410 shotgun to Clement's head. Defendant had taped the gun to his right forearm and was holding his left hand on the trigger. Clement pushed the gun away asking, "What's this, what's going on?" Defendant again placed the gun in front of Clement's face. Defendant repeatedly told Clement that he was going to kill her, that she was going to die, and that she was going to pay. Clement eventually succeeded in pursuading defendant to come into her house for coffee and to talk. Defendant, Clement, Simpson and Asuna all entered the kitchen area where Clement prepared coffee. Defendant, Clement and Simpson sat down at the kitchen table, where defendant resumed aiming the shotgun at Clement. Clement poured coffee for everyone.

Defendant demanded from Clement their mother's Bible and alleged that Clement owed him $24,000. Defendant accused Clement of stealing his money while he was in prison. Defendant had given Clement permission to handle his veteran's disability benefit checks while he was incarcerated. According to Clement's testimony at trial, defendant made numerous threats:

> He kept telling me that ... I was going to die ... He said he was going to kill my sister and brother-in-law and her kids and my other sister that was on their way down from coming in from Palm Beach and Louisiana. He talked, but he really wasn't rational.

After some conversation, Clement lunged at defendant, grabbing the shotgun. They both struggled until Clement pried the shotgun away from defendant. Clement then slid the shotgun on the floor to Asuna, who was already telephoning the police. Defendant left Clement's home after Simpson told him that the police had been summoned.

On 11 July 1985, the Yuma County Grand Jury indicted defendant for three crimes. The state also alleged dangerousness, prior conviction for robbery, and commission of the offenses while on parole. On 3 September 1985, the trial court granted defendant's motion for a mental examination pursuant to Rule 11, Arizona Rules of Criminal Procedure, 17 A.R.S., to determine his competency to stand trial. A psychologist and a psychiatrist were appointed by the court to examine defendant. Both of these specialists concluded that defendant was responsible for his actions and that he believed that he was justified in his actions. Notwithstanding that the psychologist believed that defendant was overwhelmed by impulse, both the psychologist and psychiatrist concluded that defendant knew right from wrong. Additionally, based upon this evidence, the trial court concluded that the defendant was mentally competent to assist his attorney in preparing for trial. After trial by jury, the defendant was found guilty of all three counts.

On 7 November 1985, the trial court held a hearing at which it was shown that defendant was on parole at the time of his crimes on 29 July 1985. The trial court sentenced defendant to life imprisonment on each count in accordance with A.R.S. § 13–604.02(A). From the verdicts and sentences, defendant appeals.

## I. LIMITATION ON TESTIMONY OF EXPERTS

The experts appointed by the trial court to examine defendant were Dr. Eva B.

McCullars, a psychiatrist, and Dr. Bruce Hart, a psychologist. After filing reports with the court, both experts testified at the trial. The trial court limited the testimony of the experts, however, by not allowing testimony about defendant's childhood and past hospitalizations.

██ Defendant contends that limiting the scope of the experts' testimony improperly restricted introduction of relevant evidence concerning past mental illness and hospitalization.[1] Defendant wanted the experts to elaborate on their assessment procedures and the type of tests which were administered to him. Defense counsel's offer of proof stated:

> My offer of proof would be simply the reports of Dr. Hart and Dr. McCullars. I was simply going to take them through their reports step by step and have them describe for the jury what they found. I wasn't going to go too much farther than what's in the reports except to have them elaborate on the points that they will touch on. I may have them explain what they mean by that, but basically what is in Dr. Hart's and Dr. McCullar's reports is what I had intended on asking about at the time of trial.

The trial court, however, wanted to narrow the factual issues that the jury could consider. The trial judge stated:

> I think a description of the defendant's problems in the past and ... his childhood history and past hospitalizations and to some extent his personality disorder, if any, would distract the jury from true questions which are whether or not at the time he committed these crimes he was not responsible for his actions under the McNaughton Rule.

> \*   \*   \*   \*   \*   \*

> You can ask him [the experts] if he [they] administered tests and he [they] can answer yes, but I don't want him [them] to describe what the tests were or the results were. Those would be meaningless to the jury. In other words, I want to restrict it as much as possible to their opinion and their reasons without them giving the factual underlying data.

Defendant contends that this restriction amounted to prejudicial error. Our rules of evidence state:

### Rule 705. Disclosure of Facts or Data Underlying Expert Opinion

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Arizona Rules of Evidence, 17A A.R.S.

██ Under Rule 705, much of what defendant wanted to offer in evidence would be admissible if otherwise relevant and material. We have held, however, that error cannot be predicated upon a ruling which merely admits or excludes evidence unless a substantial right of a party is affected. *State ex rel. La Sota v. Arizona Licensed Beverage Ass'n, Inc.*, 128 Ariz. 515, 523, 627 P.2d 666, 674 (1981), *relying upon* 17A A.R.S. R. of Evid., Rule 103(a). Defendant does not show how his Rule 11 right was affected by the court's evidentiary ruling. Also, we see no prejudice to the defendant in limiting the testimony of the experts. The defendant's history, while helpful to the experts, was not necessary for the jury to reach a decision as to whether the defendant knew the difference between right and wrong at the time he committed the crimes. We hold that the trial court did not abuse its discretion in limiting the testimony of the experts at trial. *State v. Williams*, 132 Ariz. 153, 160, 644 P.2d 889, 896 (1982).

---

**1.** The state made two motions *in limine* to preclude any testimony regarding defendant's history of mental illness or prior hospitalization and to limit evidence of defendant's intoxication. Both motions were denied. The defense argues on appeal that neither motion should have been heard by the trial court because the state waited until a "strategically convenient time to spring their motion on the defense." Because the motions were denied and we see no prejudice to defendant, we do not consider defendant's objections.

■ Defendant also objects to the trial court's ruling that although the experts could testify as to the effect of intoxication on defendant, they could not testify as to the extent of defendant's intoxication at the time he committed the crimes. We agree with this ruling. As experts, they could testify as to the effects of intoxication upon defendant. They were not, however, witnesses as to the extent of defendant's intoxication, and the trial court did not abuse its discretion in restricting the testimony of the experts to the effect of intoxication and not the extent of the intoxication. *Cf. State v. Hicks,* 133 Ariz. 64, 71, 649 P.2d 267, 274 (1982) (no error in precluding expert testimony on effect of intoxication). We find no error.

## II. INSTRUCTION CONCERNING UNAVAILABILITY OF INSANITY DEFENSE WHERE USE OF ALCOHOL IS VOLUNTARY

The defense raised the issue of insanity because of defendant's history of mental injury and illness. This history was succinctly described in the psychiatry report by Dr. McCullars:

He [defendant] describes four incidents of head injuries. The first occurred at the age of three to four years of age when he fell out of a barn loft and was unconscious for an indefinite period of time. The second incident occurred when he was shot during a bar room brawl with a .22 caliber pistol in the forehead necessitating an insertion of a steel plate in his frontal area. This occurred in 1972. The third incident occurred in 1978 or 1979 when while intoxicated he turned over a pickup truck while driving and split his scalp open. He was hospitalized for one day and then signed out against medical advice. Finally, the fourth time he was hit with a rock or a ball bat on the side of his right temple, was knocked unconscious, and was hospitalized for five to six days. The patient reports auditory hallucinations while in the army which occurred during an argument with a sargeant.

Even though defendant sustained these head injuries, he was not declared by the experts to have a permanent mental illness or mental defect sufficient to relieve him of responsibility for his acts.

■ The test of insanity in Arizona is whether the defendant knew the nature and quality of his actions at the crucial time. In the alternative, the test requires that the defendant be able to distinguish right from wrong. *See* A.R.S. § 13–502(A). This is a modified *M'Naghten* test and it has been sustained repeatedly as the sole test for sanity in criminal cases in Arizona. *State v. Steelman,* 120 Ariz. 301, 312, 585 P.2d 1213, 1224 (1978); *State v. Heath,* 122 Ariz. 36, 39, 592 P.2d 1302, 1305 (App. 1979). This test also requires a defendant to prove by clear and convincing evidence that he is not responsible for his criminal conduct by reason of insanity. A.R.S. § 13–502(B).

■ Evidence at trial indicated that defendant had a preexisting "mental disorder" condition. The experts who testified at the trial both concluded, however, that Hudson's "mental disorder" was triggered by his voluntary consumption of alcohol. Dr. McCullars stated:

I felt that Billy was suffering from some type of mental disorder, but at the same time he was attempting to exaggerate those symptoms.

＊　＊　＊　＊　＊　＊

He has a disfunction in a part of his brain that controls his emotions and *given sufficient stress, one of those stressors being alcohol,* the person loses control over his ability to regulate his emotions.

(emphasis added). As a result, the trial court gave the following instruction:

The defense of insanity is not available to a defendant who, because of his voluntary use of alcohol, has a temporary episode of mental incapacity so as to be unable to know right from wrong or to not know the nature and quality of his acts. Additionally, the defense of insanity is not available to a defendant who

has a temporary episode of mental incapacity so as to be unable to know right from wrong or to not know the nature and consequences of his acts caused by the voluntary use of alcohol combined with a preexisting mental condition.

No evidence offered at trial indicated that defendant was suffering from permanent insanity caused by injury, illness, or intoxication. As to temporary insanity at the time he committed his criminal acts, the insanity defense is not available to a defendant whose voluntary use of intoxicating alcohol and/or drugs aggravates a pre-existing mental disorder or creates a temporary episode of mental incapacity. *State v. Curry*, 127 Ariz. 1, 2, 617 P.2d 785, 786 (App.1980). We find no error.

## III. WHETHER A FINDING OF DANGEROUSNESS BY THE JURY IS REQUIRED BEFORE A FINDING OF GUILT ON WEAPONS CHARGES

■ Pursuant to A.R.S. § 13–604.02, the defendant was sentenced to life imprisonment on the two weapons charges because he committed the crimes while on parole. This statute reads in relevant part:

§ 13–604.02 *Offenses committed while released from confinement*

A. Notwithstanding any provision of law to the contrary, a person convicted of any felony offense involving the use or exhibition of a deadly weapon or dangerous instrument ... if committed while the person is on ... parole ... shall be sentenced to life imprisonment and is not eligible for ... release from confinement ... until the person has served not less than twenty-five years.

Defendant concedes that the jury's verdict on the aggravated assault charge necessarily contained a finding that a deadly weapon was used. Defendant contends, however, that as to count two (misconduct involving a deadly weapon) and count three (possession of a deadly weapon by a parolee), the element of dangerousness must be found separately by the jury. The defendant relies upon an analogy between A.R.S.

§ 13–604.02(A) and A.R.S. § 13–604(K). This latter statute states:

K. The penalties prescribed by this section shall be substituted for the penalties otherwise authorized by law if the previous conviction, [*or*] the dangerous nature of the felony ... is charged in the indictment or information and admitted *or* found by the trier of fact.... For the purposes of this subsection, "dangerous nature of the felony" means a felony involving the use or exhibition of a deadly weapon or dangerous instrument *or* the intentional or knowing infliction of serious physical injury upon another.

A.R.S. § 13–604(K) (emphasis added). This court has previously held, however, that the analogy which the defense draws between A.R.S. §§ 13–604.02(A) and 13–604(K) is incorrect because § 13–604.02(A) does not require a finding by the trier of fact nor an admission by the defendant. Additionally, the commission of a crime while on parole is in the nature of an aggravated circumstance which enhances the possible penalty. *State v. Turner*, 141 Ariz. 470, 475, 687 P.2d 1225, 1230 (1984) (disallowed analogy between A.R.S. § 13–604(K) and A.R.S. § 13–604.01, which was subsequently amended and renumbered to A.R.S. § 13–604.02 by Laws 1985, ch. 364, § 5, effective May 16, 1985). Furthermore, the instant case is in compliance with A.R.S. § 13–604(K) because the defendant admitted at trial to using and exhibiting a dangerous weapon and the trial court modified the proposed verdicts to add "to-wit, a sawed-off shotgun, a deadly weapon." Defendant's counsel concurred in the modification. The trial court is bound by the statutory mandate of A.R.S. § 13–604.02(A) to impose a life sentence for each of defendant's convictions. We find no error.

## IV. WHETHER VIOLENCE IS A NECESSARY ELEMENT OF ROBBERY WITHIN THE AMBIT OF "PROHIBITED POSSESSOR" IN A.R.S. §§ 13–3102(A)(4), –3101(5)(b)

■ At the close of the state's case, the defendant moved for a directed verdict of

acquittal on Count III, possession of a deadly weapon by a prohibited possessor.

The statute reads as follows:

A. A person commits misconduct involving weapons by knowingly:

\*　　\*　　\*　　\*　　\*　　\*

(4) Possessing a deadly weapon if such person is a prohibited possessor....

A.R.S. § 13–3102(A)(4).

A prohibited possessor is defined as any person:

Who has been convicted within or without this state of a felony involving violence *or* possession and use of a deadly weapon or dangerous instrument and whose civil rights have not been restored.

A.R.S. § 13–3101(5)(b) (emphasis added).

Robbery is defined by our statute:

A person commits robbery if in ·the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property.

A.R.S. § 13–1902(A).

The evidence showed that defendant had been convicted of robbery and that defendant's civil rights had not been restored. Therefore, the defendant was a "prohibited possessor."

 The defendant contends that the State had to prove that the previous robbery was a felony involving the use of violence. We do not agree. By definition, robbery is a crime involving violence. We have stated that when determining aggravating circumstances for sentencing we may take judicial notice that certain crimes are violent in nature. *State v. Tittle,* 147 Ariz. 339, 345, 710 P.2d 449, 455 (1985); *State v. Nash,* 143 Ariz. 392, 404, 694 P.2d 222, 234 (1985). Likewise, in applying the definition of "prohibited possessor" we may also take judicial notice that certain crimes, by nature, involve violence. *Cf. Turner, supra.* Defendant was a prohibited possessor because he had engaged in violence by committing robbery. A person commits misconduct involving a weapon by knowingly possessing a deadly weapon if such person, as here, is a "prohibited possessor." A.R.S. § 13–3102(A)(4). We find no error.

We have reviewed the record for fundamental error. A.R.S. § 13–4035; *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *State v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969). We have found none.

The judgments, convictions, and sentences are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.