[Civil No. 2506. Filed April 4, 1927.]

[254 Pac. 1060.]

THE TEXAS COMPANY, a Corporation, Appellant,
v. STATE, Respondent.

Messrs. Prosser & Freeman, Mr. Edward J. Flanigan and Messrs. Ellinwood & Ross, for Appellant.

Mr. John W. Murphy, Attorney General, and Mr. A. R. Lynch, Assistant Attorney General, for the State.

LOCKWOOD, J.—In 1921 the fifth legislature of the state of Arizona passed chapter 116 of the Session Laws of that year, being an act entitled "To provide a license tax on gasoline; to provide for the collection thereof, . . . " and for other purposes. Sections 1, 2 and 7 thereof read as follows:

"Section 1. *Definition.* The following words, terms and phrases in this act are, for the purposes thereof, defined as follows:

"(a) The term 'dealer' is hereby defined as any person, firm or corporation who imports or causes to be imported gasoline for use, distribution or sale in, and after the same reaches the state of Arizona; and also any person, firm or corporation who produces, refines, manufactures or compounds such gasoline in the state of Arizona for use, distribution or sale in this state.

"Sec. 2. That in addition to the taxes now provided for by law, each and every dealer, as defined in this act, who is now engaged or who may hereafter engage in his own name, or in the name of others, or in the name of his representatives or agents in this state, in the sale or distribution, as dealers and distributors of gasoline shall not later than the fifteenth (15) day of each calendar month render a statement to the secretary of state of the state of Arizona of gasoline sold or distributed by him or them in the state of Arizona during the preceding calendar month, and *pay a license tax* of one (1) cent per gallon on all gasoline so sold or distributed, as shown

by such statement in the manner and within the time hereinafter provided, which tax shall be added to the sales price of the dealer as herein defined." [Italics ours.]

"Sec. 7. Said license tax shall not be imposed on gasoline when sold for exportation from the state of Arizona to any other state or nation."

The act further provided that all dealers in gasoline should file a certificate showing various matters in regard to the character of the dealer and its responsible officials or agents; that they should render proper reports of the gasoline sold, keep a record of their purchases and sales, and pay the tax so levied to the Secretary of State at certain times and in a certain manner.

In 1922 the same legislature in special session (chapter 24) amended sections 2 and 7 above quoted to read as follows:

"Sec. 2. That in addition to the taxes now provided for by law, each and every dealer, as defined in this act, who is now engaged or who may hereafter engage in his own name, or in the name of others, or in the name of his representative or agents in this state, in the sale or distribution, as dealers and distributors of gasoline shall not later than the fifteenth (15) day of each calendar month render a statement to the secretary of state of the state of Arizona of gasoline sold or distributed by him or them in the state of Arizona during the preceding calendar month, and *collect a license tax* of one (1) cent per gallon on all gasoline so sold or distributed, as shown by such statement in the manner and within the time hereinafter provided, which tax shall be added to the sale price of the dealer as herein defined." [Italics ours.]

"Sec. 7. Said license tax shall not be imposed on gasoline when sold for exportation from the state of Arizona to any other state or nation or when sold to the government of the United States or any agencies thereof."

In pursuance of these acts the Texas Company, a corporation, hereinafter called appellant, filed its certificate as dealer and rendered its accounts and made payments to the Secretary of State as provided in the acts up to June 9th, 1923. During this period appellant was primarily a manufacturer selling at wholesale gasoline made by it and brought into the state of Arizona for the purpose of thus being sold at wholesale. It neither owned nor operated any so-called "filling stations" within the state, and the small quantity of gasoline which it sold direct to consumers represented an exception to its general policy of selling only at wholesale.

In 1923 the sixth legislature in regular session passed and sent to the Governor Senate Bill No. 156, entitled "An act . . . providing for the raising of funds . . . by means of . . . a tax . . . upon gasoline and other distillates of crude petroleum, . . . " and for other purposes. Section 10 of the bill was divided into three subsections, and subsection 3 had some nine paragraphs, lettered (a) to (i), inclusive. Those paragraphs material to the determination of this case are quoted below:

"(a) That each and every dealer, as defined in this act, who is now engaged or who may hereafter engage in his own name, or in the name of others, or in the name of his representative or agents of this state in the sale, use or distribution, as dealers and distributors of gasoline or other distillates of crude petroleum shall not later than the fifteenth (15) day of each calendar month render a statement to the secretary of state of the state of Arizona of gasoline and other distillates of crude petroleum sold, used or distributed by him or them in the state of Arizona during the prrceding calendar month, and collect a license tax of three (3) cents per gallon on all gasoline and other distillates of crude petroleum so sold, used or distributed for use in motor propelled or motor driven vehicles, as shown by such statement in

the manner and within the time hereinafter provided, which tax shall be added to the sale price of the dealer as herein defined when sold, used or distributed for such use in said motor propelled or motor driven vehicles only.''

''(c) Every dealer in gasoline and other distillates of crude petroleum shall render to the secretary of state of the state of Arizona, on or before the fifteenth (15) day of each month, on forms prescribed, prepared and furnished by the secretary of state, a sworn statement of the number of gallons of gasoline and other distillates of crude petroleum sold or used by him or them during the preceding calendar month together with the number of .gallons of gasoline or other distillates of crude petroleum sold or used by him or them during the preceding calendar month for use in motor propelled or motor driven vehicles as defined herein, which statement shall be sworn to by one of the principal officers in case of a domestic corporation or by the resident general agent or attorney in fact in case of a foreign corporation; by the managing agent or owner in case of a firm association, and shall contain the total number of gallons of gasoline and other distillates of crude petroleum, sold, used or distributed. Bills shall be rendered to all purchasers of gasoline or other distillates of crude petroleum by dealers, as herein defined. Said bills shall contain a statement printed thereon in a conspicuous place that the dealer in gasoline has assumed the liability to the state for the license tax herein imposed and that he or they will pay said license tax on or before the fifteenth (15) day of the following month. In addition to the statement herein prescribed, the dealer shall present to the secretary of state, on a form prescribed, prepared and furnished by the secretary of state, a statement signed by the purchaser of any gasoline or other distillates of crude petroleum purchased for any other purpose than use in motor propelled or motor driven vehicles as herein defined, showing the number of gallons of gasoline or other distillates of crude petroleum so purchased, and the purpose of use for which such gasoline or other distillates of crude petroleum is purchased. Failure to present such statement so

signed by said purchaser shall be *prima facie* evidence that the gasoline or other distillates of crude petroleum was sold or distributed by said dealer for use in motor propelled or motor driven vehicles as herein defined, and the dealer shall pay the license tax herein prescribed on all such gasoline and other distillates of crude petroleum not accounted for by such statement from such purchaser.''

''(f) Said license tax shall not be imposed upon gasoline and other distillates of crude petroleum when sold for exportation from the state of Arizona to any other state or nation, or when sold to the government of the United States or when sold or distributed for use in motor propelled or motor driven farm tractors or other motor propelled or motor driven farm machinery and implements, or motor propelled or motor driven vehicles running only upon rails or tracks.''

''(h) Whenever any dealer as defined herein shall fail to pay such license tax as herein provided for a period of thirty (30) days from and after the date when the same should have been paid as required by this act, the Attorney General shall commence and prosecute to final determination an action at law to collect the same.

''(i) The following words, terms and phrases used in this subdivision are, for the purposes thereof, defined as follows:

''The term 'dealer' is hereby defined as any person, firm or corporation who imports or causes to be imported gasoline or other distillates of crude petroleum for use, distribution or sale in, and after the same reaches the state of Arizona; and also any person, firm or corporation who produces, refines, manufactures or compounds such gasoline or other distillates of crude petroleum in the state of Arizona for use, distribution or sale in this state.

'' 'Motor propelled or motor driven vehicles' is defined to mean all vehicles propelled or driven by power, other than muscular power, except farm tractors and farm machinery and implements, and such motor propelled or motor driven vehicles as run only upon rails or tracks.''

The bill was forwarded by the Governor to the Secretary of State with a letter which reads, in part, as follows:

"I am sending you with my signature and approval, with the exception of certain items which I have enumerated and which are listed in detail below, Senate Bill 156. . . . I also veto and disapprove paragraph (a), subsection 3, of section 10, which reads as follows: [Quoting the paragraph vetoed.]"

The act became effective June 9, 1923. By its terms, as will be seen, it was the duty of the Secretary of State to prepare and furnish the forms to be used by the dealers in making their returns both of the gasoline sold in gross and of the amount which was sold to be used for any other purpose than in motor propelled or motor driven vehicles. In view of the veto aforesaid the Secretary of State wholly neglected and refused to furnish to any dealer in gasoline any of the forms of reports above referred to, and announced that he would not enforce or carry out the provisions of the gasoline tax of said Senate Bill 156 unless and until the Supreme Court of this state should hold the Governor's veto of that tax unconstitutional. If such veto was constitutional the only gasoline tax in force was the one imposed by the act of 1922.

Appellant, from June 9th until July 18th, inclusive, collected the tax in accordance with the act of 1922 and duly accounted therefor, but learning that the constitutionality of the veto was about to be tested in the courts, from and after such date, in order to protect itself in case the veto was held unconstitutional, did collect and pay a gasoline tax according to the terms of the vetoed section of Senate Bill 156.

On July 28th, 1923, an action was filed in the superior court of Maricopa county to test the validity of the veto above set forth, which veto was, on August

23d, by this court, held to be unconstitutional, and the gasoline tax provided by Senate Bill 156 declared of full force and effect; it necessarily following that it had so been since June 9th, the date of taking effect of the original act. Thereafter the state of Arizona, hereinafter called appellee, brought suit against appellant to collect the amounts which it contended appellant should have collected and paid on account of its sales of gasoline from June 9th to July 18th, inclusive, under the act of 1923, claiming that appellant should have collected a gasoline tax of three (3) cents instead of one (1) cent on some four hundred sixty-eight thousand gallons of gasoline. Judgment was rendered in favor of appellee for the full sum sued for and appellant has brought the case before us for review.

There are some eighteen assignments of error which we will consider according to the legal propositions raised thereby. The first contention of appellant is that the gasoline tax imposed by the 1923 law is an excise or license tax, not upon the seller, but upon the purchaser buying the gasoline for use in motor propelled or motor driven vehicles, which tax the seller merely collects by adding the amount to the sale price of the gasoline, while appellee claims it is a tax levied on the seller for the privilege of dealing in gasoline.

The language of the acts of both 1922 and 1923 is that it is the duty of each and every dealer to "*collect* a license tax" and the same clause also provides the tax "shall be added to the sale price of the dealer as herein defined. . . . " The act of 1921, on the contrary, provided that the dealer should "*pay* a license tax." It is obvious from this that the legislature, deeming that under the act of 1921 it might be contended the tax was upon the dealer, carefully changed the language in those statutes of 1922 and

1923, so that there could be no doubt it was acting merely as a collector of a tax. This construction seemed so clear that we assumed, in *Black & White Taxicab Co.* v. *Standard Oil Co.*, 25 Ariz. 381, 218 Pac. 139, this was the case without going into any discussion as to the reasons therefor. A similar act was construed by the Supreme Court of Arkansas in *Standard Oil Co.* v. *Brodie et al.*, 153 Ark. 114, 239 S. W. 753, wherein the court said:

"The tax is not imposed on the sale or purchase of gasoline, nor on the gasoline itself, nor even on the use of the gasoline. On the contrary, the final and essential element in the imposition of the tax is that the gasoline purchased must be used in propelling a certain kind of vehicle over the public highways. In the final analysis of this language it comes down to the point that the thing which is really taxed is the use of the vehicle of the character described upon the public highway, and the extent of the use is measured by the quantity of fuel consumed, and the tax is imposed according to the extent of the use as thus measured. . . . It must be remembered that the tax is not laid on the sale of the gasoline, nor upon the business of the dealer. The dealer is not required to pay the tax, but to collect it, keep and present an account thereof, and pay it over to the county treasurer. *The purpose of the statute is twofold, namely, to impose a tax upon the purchaser of gasoline for the use of the car, and to regulate the business of the dealer by requiring him to collect the tax and pay it over to the county treasurer.*" (Italics ours.)

This construction of the statute was accepted by the Supreme Court of the United States in *Pierce Oil Co.* v. *Hopkins,* 264 U. S. 137, 68 L. Ed. 593, 44 Sup. Ct. Rep. 251 (see, also, Rose's U. S. Notes), and the law held constitutional. We agree fully with the Supreme Court of Arkansas in the language above quoted, and hold that—

Our gasoline tax is also "a tax upon the purchaser of gasoline for the use of the car, and to regulate

the business of the dealer by requiring him to collect the tax. . . . ''

The next contention of appellant is that it is not, within the provisions of the statute, one of the dealers whose duty it is to collect the tax. While admitting that it is within the literal definition of the term ''dealer'' found in Senate Bill 156, and the preceding acts referred to, and that it did file a certificate under all these acts as a dealer, yet, nevertheless, it claims that under the act of 1923 it was intended the dealer whose duty it was to collect the tax was the last person who sold gasoline to the ultimate consumer, and not one who sold merely for the purpose of resale by another.

It is apparent the tax is in the end paid by the ultimate consumer. All intermediaries in the process of getting it from the consumer into the coffers of the state are nothing but collecting agencies, and it is a matter resting solely in the discretion of the legislature as to how the tax should be collected, and by whom, whether directly by the last dealer, or indirectly by the first.

Appellant does not deny that it is possible for the state to impose the duty of collecting the tax upon the original seller, but contends the law does not so provide. It urges in support of its theory that, if the tax were imposed on all sales of gasoline, it might be logical to assume the original seller must collect the tax, and that each subsequent dealer would merely pass it along the line until at last it rested on the ultimate consumer, but that, where, as under our statute, the tax is imposed on a certain class of consumers only, and therefore it cannot be determined until it reaches the consumer whether or not a tax lies on the sale, it must be presumed the legislature intended the only dealer who is in a position to de-

termine whether the tax applied should be the one who collected it.

The theory advanced by appellant is one which would doubtless appeal to a legislator concerned only with distributing the burden and duties in accordance with the situation from the viewpoint of the dealer and consumer. But it overlooks entirely what we are satisfied was the controlling idea on this point with our legislature, to wit, the convenience to the state of dealing only with a few large wholesalers, rather than a multitude of retailers. It cannot be disputed it would be much more convenient for the original dealer if the burden were not imposed on it of collecting the tax on all gasoline sold by it where it did not at the time appear to be tax free, and of obtaining the evidence which would justify a refund to it by the state when a later sale disclosed its exemption. On the other hand, it is equally true that it is decidedly more convenient for the state to deal only with a half dozen large wholesalers, rather than to have the burden and expense of keeping track of the ultimate sales made by hundreds of retailers. As to which course should be adopted is a matter of policy for the legislature to determine, and the burden imposed is merely a regulation on the dealer in gasoline. *Standard Oil Co.* v. *Brodie,* and *Pierce Oil Co.* v. *Hopkins, supra.*

We are satisfied from an examination of the language of the three statutes and the contemporaneous construction placed thereon by the administrative department of the state that it is and always was the intention of the legislature that the original seller within the state should collect the tax upon the sale made by it, with the right to obtain a refund or credit from the state, when it was established that any gasoline sold was not ultimately liable to the tax. We are of the opinion that it was the duty of the appellant

under the 1923 statute to collect the tax on all gasoline sold by it and ultimately subject to tax, and the burden was upon it to establish that any gasoline on which it did not collect the tax was exempt.

The third and most difficult question is whether or not under the facts above set forth appellant was responsible for its failure to collect the three-cent tax before the veto of the Governor was determined to be unconstitutional. Appellant's argument on this point may be summarized as follows: The Governor of the state in the exercise of his veto is just as much part of the law-making machinery of the government as is the legislature, and his acts in the use of the veto are presumptively as valid as the act of the legislature in passing a statute. When, therefore, Senate Bill 156 was delivered to the Secretary of State with the Governor's disapproval of the gasoline tax annexed thereto, the presumption was that the bill was a law, with the vetoed portion stricken therefrom, and appellant, both as an individual and as an agent of the state charged with the duty of collecting a tax, was justified in acting upon the legal situation as it would have existed had the veto been constitutional, and cannot be penalized for its acts in so doing. Appellee's position, on the other hand, is that, since the veto was unconstitutional, no more rights or protection were given appellant by reason thereof than if such power had never been exercised. The nature of the veto power was before us in the case of *Fairfield* v. *Foster*, 25 Ariz. 146, 214 Pac. 319. Therein we said:

"Now this power, though exercised by an officer whose functions were principally executive, was essentially legislative in its nature. 1 Blackstone, Comm. 361. And it has never been seriously questioned that the veto power of our Governors was of the same kind, though negative only in character. [Citing cases.] Under our system of government in Arizona, .

it is as necessary that the Governor act on a law as that the Legislature itself do so. Even though a bill carry unanimously in both houses, it must still go to the Governor for his approval or disapproval, and, in case of the latter, must follow the constitutional course before it becomes a law.''

We further think that a veto exercised by the Governor is entitled to just as much respect as the act of the legislature in originally passing a law, and it would be proper to say that, as we indulge every intendment in favor of the constitutionality of an act as originally passed by the legislature, we should also have the same presumption in favor of the constitutionality of a veto. The reason for this rule is, of course, the respect due the act of a co-ordinate branch of the government.

If such is the rule which even this court follows, it was only natural that appellant and others in a similar situation, particularly when the officer charged with the duty of providing the machinery for carrying into effect the tax of 1923, had assumed that the veto of the gasoline tax was constitutional and failed to provide the necessary forms which the act required a dealer to use, should act upon the theory that the law of 1922 was still in force so far as the gasoline tax was concerned. Notwithstanding this would be the presumptive conduct of the ordinary layman, it is urged by appellee that, since it was afterwards held the veto was unconstitutional, appellant cannot legally, though it might morally, avoid responsibility for its failure to collect the tax under the 1923 law.

The legal question involved may be stated as follows: Is a citizen liable to the state for a penalty because he has in good faith followed the provisions of a law which on its face was duly enacted, when those parts under which he acted are afterwards held to be unconstitutional? There are two distinct lines of authority in this country, bearing on the matter,

and reaching opposite conclusions. The leading case on one side is *Norton* v. *Shelby County*, 118 U. S. 425, 30 L. Ed. 178, 6 Sup. Ct. Rep. 1121 (see, also, Rose's U. S. Notes). The substance of that decision, so far as it is apropos to the question above stated, is summed up in the following statement of Justice FIELD:

"An unconstitutional act is not a law; it confers no rights; it imposes no duties; *it affords no protection*; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." (Italics ours.)

This language has been approved and followed many times in different states. The contrary doctrine is best illustrated by the language of *Lang* v. *Mayor, etc.*, 74 N. J. L. 455, 122 Am. St. Rep. 391, 12 Ann. Cas. 961, 15 L. R. A. (N. S.) 93, 68 Atl. 90, wherein the court says, quoting from *State* v. *Carroll*, 38 Conn. 449, 9 Am. Rep. 409:

"Every law of the Legislature, however repugnant to the Constitution, has not only the appearance and semblance of authority, but the force of law. It cannot be questioned at the bar of private judgment, and if thought unconstitutional, resisted, but must be received and obeyed as, to all intents and purposes, law, until questioned in and set aside by the courts."

This case has also been repeatedly followed in numerous jurisdictions. Strange as it may seem, the writers of both opinions base their conclusions principally upon the case of *State* v. *Carroll, supra.* We have examined that case carefully, and are of the opinion that it emphatically upholds the rule adopted in *Lang* v. *Mayor, etc., supra,* when the question for decision is the one which we have stated. In the Carroll case, using the language quoted above, Mr. Justice BUTLER goes on to say:

"This principle is essential to the very existence of order in society. It has never been questioned by any jurist to my knowledge. It was never questioned even by Mr. Calhoun and his disciples that an unconstitutional law of Congress, manifestly and palpably unconstitutional, had the color and semblance of authority, and was obligatory upon the citizens of a state, as citizens of the United States, until it was nullified by an act of the state Legislature. . . . Certainly they never asserted that a legislative enactment of a state, having all the forms of law, had not the force of law to all intents and purposes as against the citizen of the state, however repugnant to the state Constitution, until set aside by the courts.

"The doctrine that a law of doubtful constitutionality may be presumed to be constitutional until judicially decided otherwise, and that a law manifestly unconstitutional cannot be so presumed, has no existence as applicable to the citizen. There is a rule of judicial construction adopted by the courts, to the effect that unless the law is clearly unconstitutional, or if it is of doubtful constitutionality, they will not declare it unconstitutional. But that is a rule of *purely judicial construction,* and can have no other application. . . . It has never been claimed to my knowledge before that the citizen may adopt that judicial rule of construction and treat a law, manifestly unconstitutional, as without the semblance or color of authority."

As was well said in the case of *State* v. *Godwin et al.,* 123 N. C. 697, 31 S. E. 221:

"What an anomalous state of things would we have then, if a person believing himself to be a public officer, because of the discharge of the duties which he thought he owed to the public, should afterwards be indicted and punished because the courts had held the act, which created the office and prescribed its duties, to be against the provisions of the Constitution and void. Such a proposition would be equivalent to declaring that the individual office holder must be wiser than the whole people represented in their Gen-

eral Assembly. Such a proposition to us seems opposed to every idea of justice. It could not be true. The criminal law cannot be invoked to punish one who acts as a public officer, as an agent of the people, and who in the discharge of a public duty had obeyed an act of the lawmaking power, even though the law be unconstitutional, unless the act itself had required the committal of a crime—a thought which could not be entertained for a moment. And it makes no difference that in the case before the court the defendants are indicted for a refusal to perform certain duties under a former law attempted to be repealed by a subsequent unconstitutional statute, and not for doing positive acts under an unconstitutional law. The principle is the same in both cases. The defendants here cannot be punished under the criminal law for failing and refusing to perform the duties of an office, which office, and the duties pertaining to it, had been sought to be repealed by a subsequent act of the Legislature, afterwards declared by the courts to be unconstitutional. *Until the subsequent statute was declared to be unconstitutional by competent authority, the defendants, under every idea of justice and under our theory of government, had a right to presume that the lawmaking power had acted within the bounds of the Constitution, and their highest duty was to obey.*" (Italics ours.)

Substituting the word "veto" for the word "statute" italicized above, the principle just quoted applies perfectly to the instant case. Appellants herein, if not officers, were certainly agents of the state, charged with a specific duty, to wit, the collection of the gasoline tax. On the 9th of June the law of the state, which, of course, included the veto, on its face provided that a tax of one cent per gallon was to be collected by it, and until that veto was declared unconstitutional, as was said in the case of *State* v. *Godwin, supra*—

"the defendants, under every idea of justice and under our theory of government, had a right to pre-

sume that the lawmaking power had acted within the bounds of the Constitution, and their highest duty was to obey.''

While in this case the appellee, it is true, has not endeavored to prosecute appellant criminally, it is attempting to collect from it a penalty, for it is not disputed, and cannot be, that appellant, relying upon what it believed to be the law, did not collect the tax for which it is now being sued, or any part thereof, and that it is now and was, after the 18th of July, 1923, practically impossible for it to collect it. If the judgment is paid, it must come from the private funds of appellant, without any reasonable possibility of its being recovered from those who ultimately should have paid the tax.

It is not necessary for the purposes of this case and the principle which we lay down to go into a discussion of the effect of contracts executed and executory made under the authority of an act afterwards declared unconstitutional. Nor need we consider the abstract question of whether or not the acts of a *de facto* occupant of a *de facto* office are binding on third parties. What we do say is that it would be the height of injustice for the state to penalize, either by criminal process or civil action, one of its citizens for obeying a law which on its face was adopted in a constitutional manner, but which was, after such obedience by the citizen, held to be unconstitutional. And therefore, following the rule laid down in *Lang* v. *Mayor, etc., supra,* and *State* v. *Godwin, supra,* we hold that in Arizona the citizen who obeys such a law cannot be penalized by the state for so doing.

It appearing from the undisputed facts in this case that appellant was justified from the 8th of June to the 18th of July, 1923, inclusive, in acting upon Senate Bill 156, *supra,* as it appeared after the Governor had

exercised his veto power as set forth above, it follows that the action of the trial court of Maricopa county was erroneous, and the judgment of the superior court of Maricopa county is reversed and the cause remanded, with instructions to enter judgment for appellant.

ROSS, C. J., and McALISTER, J., concur.