637 P.2d 1053

ARIZONA DOWNS, an Arizona Corporation, Appellant,

v.

ARIZONA HORSEMEN'S FOUNDA-TION, an Arizona Corporation; Turf Paradise, Inc., an Arizona Corporation and the State of Arizona, Appellees.

No. 15356.

Supreme Court of Arizona, En Banc.

Dec. 8, 1981.

Rehearing Denied Dec. 29, 1981.

Romley & Sherk by Elias M. Romley, Roger T. Hargrove, Phoenix, for appellant.

Snell & Wilmer by George H. Lyons, Robert J. Gibson, Phoenix, for appellee, Arizona Horsemen's Foundation.

Jennings, Strouss & Salmon by David L. White, Lisa B. Hawkins, Phoenix, and Rex E. Lee, Provo, Utah, for appellee, Turf Paradise, Inc.

Robert K. Corbin, Atty. Gen. by Alison B. Swan, David B. Goldstein, Mark Freitag, Charles L. Eger, Asst. Attys. Gen., Phoenix, for appellee, State of Arizona.

HOLOHAN, Vice Chief Justice.

This appeal was brought by Arizona Downs (Downs), an operator of horse racing meetings in Phoenix, Arizona, to challenge the judgment of the superior court declaring unconstitutional several statutes regulating horse racing in Arizona. We assumed jurisdiction. Arizona Constitution Art. VI, § 5; A.R.S. § 12–2101.

Downs and Turf Paradise, Inc. (Turf) have for many years been the holders of permits to conduct horse racing meetings in the Phoenix area. Originally Downs and Turf each owned their own track. In 1956, after completing construction of a new racing track, Turf entered into negotiations with Downs which resulted in a lease agreement whereby Downs agreed to conduct its racing meetings at the new facility of Turf. Thereafter and to the present time, Downs has conducted its horse racing meetings at the track owned by Turf.

In 1977, Arizona Horsemen's Foundation, Inc. (AHF) was organized as a non-profit corporation of Arizona horse owners and breeders to conduct racing meetings. AHF applied to the Arizona Racing Commission in 1977 and 1978 for a permit to conduct a racing meet. The applications were denied because all available dates were allocated to Downs and Turf, who had preferred status pursuant to statute. A.R.S. § 5–110(A).

AHF filed suit against Downs, Turf, and the State of Arizona contending that various sections of the racing statutes were unconstitutional and that the lease between Downs and Turf was in restraint of trade and a violation of the State's antitrust laws. Motions for partial summary judgment were made and granted by the superior court declaring several provisions of the racing statutes unconstitutional and ruling that paragraph 1 of the lease between Downs and Turf, providing for the allocation of racing dates, was a violation of the state antitrust laws. Formal written judgments were signed and filed which contained Rule 54(b) language making the judgments appealable. Rule 54(b), Rules of Civil Procedure.

In this appeal Downs challenges the ruling of the superior court declaring A.R.S. § 5–110(A) and § 5–108.01(C) and (D) unconstitutional [1]. Downs also seeks to set aside the judgment declaring the lease agreement to be in violation of the antitrust laws of Arizona.

For the reasons more fully set forth later, we reverse the judgment of the superior court.

## REGULATION OF RACING

Horse racing and wagering on such races has been regulated in Arizona for many years. Since 1935, the statutes have provided for the so-called pari-mutuel system of regulating and accounting for wagering on races run during a racing meeting, *O'Neil v. Arizona Horsemen's Ass'n*, 57 Ariz. 424, 114 P.2d 894 (1941). The state initially regulat-

ed the industry as a revenue measure, but after 1945 the legislature expanded the area of regulation by outlawing all forms of wagering or betting on horse races except those methods authorized by law. *See* *State v. Pelosi*, 68 Ariz. 51, 199 P.2d 125 (1948).

The statutory provisions relating to horse racing provide for the regulation and licensing of almost all the participants in racing meetings as well as the places and days for horse racing. *See* A.R.S. § 5–101 to 115. A commission, known as the Arizona Racing Commission, is charged with the responsibility of administering the statutory system, A.R.S. § 5–101 to 104.

Before a racing meeting may be conducted, the person or corporation intending to hold the racing meeting must obtain a permit from the Racing Commission. A.R.S. § 5–107.01. A permit to conduct a racing meeting differs from the usual type of permits or licenses issued for a year or other defined period. Racing permits are issued for a limited number of racing days within specific months. Since horse races in Arizona are generally not run every day of the week, the number of racing days granted by the Racing Commission literally means the days upon which horse racing may occur.

For a number of years the maximum number of days available for conducting horse races was limited to 120 days. In 1980, the legislature increased the number of horse racing days available in counties with populations in excess of four hundred thousand to 150 racing days.

Once a person or corporation has secured a permit to conduct a horse racing meeting, the permittee is granted a statutory preference for the same dates the following year. A.R.S. § 5–110(A). The commission may revoke a racing permit or refuse to renew a permit for any of several specific grounds set forth in the statutes, but the refusal to renew may be made only after full hearing

---

**1.** Although the superior court declared A.R.S. § 5–108(A)(1)(i), as amended in 1972, unconstitutional, Downs stated that its appeal did not involve the constitutionality of that section. We have, therefore, not considered the constitutionality of that section.

and a finding of good cause. A.R.S. § 5–108(D).

## CONSTITUTIONALITY OF A.R.S. § 5–110(A)

The parties to this appeal have focused a major portion of their argument on the constitutionality of A.R.S. § 5–110. The relevant portion of this statute reads:

Permits [for racing] shall be issued for substantially the same dates allotted to permittees during the preceding year . . . provided that, in the event there is a conflict in dates requested between two or more permittees in the same county for the same kind of racing, then and in such event, the *permittee whose application is for substantially the same dates as were allotted to him in the preceding year shall be entitled thereto in preference to any other permittee. In the event two or more permittees shall have agreed that the dates to be allotted to each of them each year shall be alternated* from one year to the next, then and in such event, *such agreement shall be recognized by the commission and such permittees shall be accorded preference over any other permittee as to those dates* to be allotted to such permittees on an alternating basis. A.R.S. § 5–110(A) (emphasis added).

Appellees claim that the statutory preference of A.R.S. § 5–110(A) violates the United States and Arizona Constitutions on any one of several grounds: (1) that it represents an impermissibly broad delegation of legislative authority to private parties; (2) that it is in violation of constitutional guaranties of due process and equal protection; and (3) that it is an unconstitutional "special law" which grants exclusive privileges and immunities. Each of these claims will be considered in turn.

At the outset, we note that we follow certain general rules of constitutional interpretation. All statutes are presumed to be constitutional and any doubts will be resolved in favor of constitutionality. *State v. Arnett*, 119 Ariz. 38, 579 P.2d 542 (1978); *New Times, Inc. v. Arizona Board of Regents*, 110 Ariz. 367, 519 P.2d 169 (1974); *McKinley v. Reilly*, 96 Ariz. 176, 393 P.2d 268 (1964), *appeal dismissed*, 381 U.S. 276, 85 S.Ct. 1457, 14 L.Ed.2d 431 (1965). Moreover, the court has a duty to construe a statute so as to give it, if possible, a reasonable and constitutional meaning. *Stewart v. Robertson*, 45 Ariz. 143, 40 P.2d 979 (1935).

The first challenge to the constitutionality of A.R.S. § 5–110(A) is that the statute provides for an improper delegation of legislative authority to private individuals. The specific challenged area of the statute is that which provides that two or more permittees may agree to alternate their racing dates from year to year, and the racing commission "shall" recognize such an agreement and grant the agreed dates to the permittees.

It is well settled that the Legislature may not delegate its powers to others. *Town of Chino Valley v. State Land Dept.*, 119 Ariz. 243, 580 P.2d 704 (1978); *Skaggs Drug Center, Inc. v. United States Time Corp.*, 101 Ariz. 392, 420 P.2d 177 (1966); *Industrial Commission v. C. & D. Pipeline, Inc.*, 125 Ariz. 64, 607 P.2d 383 (App.1980). The appellees contend that the preference for alternate racing dates is unconstitutional because it places in private parties the power to make governmental decisions without any legislative standards or limitations.

If the challenged portion of A.R.S. § 5–110(A) is read as using "shall" in the mandatory sense, the constitutionality of this part of the enactment would indeed be questionable. We, however, have a duty, whenever possible, to give a construction to a statute which will render it constitutional. *Mardian Construction Co. v. Superior Court*, 113 Ariz. 489, 557 P.2d 526 (1976). Although the word "shall" usually indicates a mandatory provision, the word has also been construed to indicate desirability, preference, or permission. *See Jack Endo Electric, Inc. v. Lear Siegler, Inc.*, 59 Haw. 612, 585 P.2d 1265 (1978); *In re Elliott*, 74 Wash.2d 600, 446 P.2d 347 (1968); *Morgan*

*v. State*, 280 Ala. 414, 194 So.2d 820, *appeal dismissed, cert. denied*, 389 U.S. 7, 88 S.Ct. 47, 19 L.Ed.2d 6 (1967).

■ Reading A.R.S. § 5–110(A) as a whole, we believe that a reasonable and constitutional construction of the challenged provision is that the word "shall" is used in a directory sense rather than in a mandatory sense. Thus, when permittees have agreed to alternate dates, the Racing Commission is required to give consideration to the preference of the permittees but the Commission is not compelled to honor such request if it is not in the public interest or convenience.

Although we have concluded that the statutory preference providing for agreements to alternate dates is directory, the statutory preference granted to permittees to have substantially the same dates as were allotted the preceding year is a quite different matter. The legislative history and consistent administrative construction applied to this preference is that it is mandatory. Since we conclude that the preference to permittees to have the same dates from year to year is mandatory, the issue of the constitutionality of such preference arises.

The appellees contend that the statutory preference for racing dates is a denial of equal protection and due process under both the federal and state constitutions. The appellees contend that the classification created by A.R.S. § 5–110(A) is illegal because it is discriminatory and not based on any rational basis.

■ It is not unconstitutional, however, for the state to treat different classes of people in varying ways. *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). Whether a particular classification is unreasonable and therefore illegal will depend on "the character of the classification in question; the individual interests affected by the classification; and the government interest asserted in support of the classification." *State v. Kelly*, 111 Ariz. 181, 184, 526 P.2d 720, 723 (1974), *cert. denied*, 420 U.S. 935, 95 S.Ct. 1143, 43 L.Ed.2d 411 (1975).

■ A two-tiered analysis is usually employed. If the substance of the challenged statute is aimed at limiting a fundamental right, we apply a test of strict scrutiny and will uphold the statute only if it is necessary to promote a compelling state interest. *See, e.g., Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (right of access to contraceptives); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (abortion rights); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to travel). Similarly, if the statute discriminates among individuals based on a "suspect class," it is also subjected to strict scrutiny. *See, e.g., Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) (alienage); *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (race).

■ If, however, the statute does not impact upon a fundamental right or a suspect class, the statute will be upheld if it has any conceivable rational basis to further a legitimate governmental interest. *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744 (1977). Our research has disclosed no cases which indicate that entry into the regulated industry of racing constitutes a fundamental right or involves a suspect class. Thus, the rational basis test is more properly applied to the challenged classification in this case. Moreover, this rational basis test is particularly appropriate to judge statutes in the areas of economics and social welfare. In *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511, 516–17 (1976), the United States Supreme Court discussed the low level of judicial scrutiny in regard to state economic regulations:

When local economic regulation is challenged . . . , this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. States are accorded wide latitude in the regulation of their local

economies under their police powers . . . . In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines . . . .

See also *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501–02 (1970); *Eastin, supra* 116 Ariz. at 582, 570 P.2d at 750. The instant racing preference constitutes just such a statute, as it attempts to regulate a sector of the economy for the benefit of the state and its citizens. *See Hubel v. West Virginia Racing Commission*, 513 F.2d 240, 243 (4th Cir. 1975) (state has dual regulatory interest in horse racing: protection of its revenues and protection of patrons from fraud).

■ Given the state's legitimate economic/revenue interest in racing, *Hubel, supra* at 243; *People ex rel. Scott v. Illinois Racing Board*, 54 Ill.2d 569, 301 N.E.2d 285 (1973), we have no difficulty characterizing the preference statute as being rationally related to this revenue-raising objective. Because of the limited number of horse racing days authorized by the Legislature, every horse racing organization is competing for a finite number of horse racing days. The state expects these same organizations to operate in a manner which will develop the maximum amount of revenue for the state and at the same time provide a regulated form of entertainment for the public. The state has a legitimate interest in encouraging reliable, proven operators to continue in the racing business and to make the necessary investment of capital and effort to develop good racing. As an incentive to investment, it is necessary to provide some assurance of continuity and predictability so that prospective operators can plan on having a certain number of annual racing days in which to recoup their investment. In a somewhat different context, the Supreme Court of New Hampshire observed: "Licenses [for racing meets] issue only after the expenditure of considerable sums of money and a certain degree of permanence is essential . . . ." *Town of Seabrook v. Perkins*, 112 N.H. 37, 40, 288 A.2d 688, 690 (1972). The policy underlying *Perkins* is the same as the potential rational basis for our preference statute: in order to attract entrepreneurs who will invest large sums of money in racing meetings, it is necessary to provide them with some assurance of a way to recover the investment.

■ There may well be additional grounds under which the preference statute could be rationally upheld. However, it is not necessary to inquire into this since we will uphold A.R.S. § 5–110(A) if we perceive *any* set of facts which rationally justify it. As stated in *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659, 670 (1981):

> The Equal Protection Clause does not deny the State of Minnesota the authority to ban one type of milk container conceded to cause environmental problems, merely because another type, already established in the market, is permitted to continue in use. Whether *in fact* the Act will promote more environmentally desirable milk packaging is not the question: the Equal Protection Clause is satisfied by our conclusion that the Minnesota Legislature *could rationally have decided* that its ban on plastic nonreturnable milk jugs might foster greater use of environmentally desirable alternatives. [emphasis in original].

See also *Eastin, supra* 116 Ariz. at 583, 570 P.2d at 751; *Kelly, supra* 111 Ariz. at 184, 526 P.2d at 723. Nor is it relevant that the preference statute may be unwise or undesirable. It is for the Legislature to balance the advantages and disadvantages of an economic regulation such as this:

> [T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.

The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial con-

ditions, because they may be unwise, improvident, or out of harmony with a particular school of thought . . . . "For protection against abuses by legislatures the people must resort to the polls, not to the courts."

*Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563, 572 (1955). *Accord, James v. Strange*, 407 U.S. 128, 133, 92 S.Ct. 2027, 2031, 32 L.Ed.2d 600, 606 (1972) ("Misguided laws may nonetheless be constitutional"); *Arnett, supra* 119 Ariz. at 48, 579 P.2d at 552 ("reasonable, even though debatable, basis" sufficient to uphold statute). Since the preference statute in this case can be viewed as rationally furthering a legitimate state objective, we find there is no violation of due process or equal protection.

 Nor is the preference statute the granting of an irrevocable privilege or franchise contrary to Article II, § 9 of the Arizona Constitution. Racing permits are subject to the requirements of the racing statutes, and such permits may be revoked for good cause. The rights of permittees are dependent upon and governed by the racing statutes. The legislature has plenary power over this type of activity. Nothing in the racing statutes guarantees permittees that the legislature may not abolish the parimutuel horse racing system or remove all regulation. *See In re Dos Cabezas Power District*, 17 Ariz.App. 414, 498 P.2d 488 (1972).

 The final constitutional challenge to A.R.S. § 5–110(A) concerns the claim that it is in conflict with Article IV, Pt. 2 § 19 of the Arizona Constitution. The relevant portion of this constitutional provision states: "No local or special laws shall be enacted in any of the following cases . . . 13. Granting to any corporation, association, or individual, any special or exclusive privileges, immunities, or franchises." Although similar policies are involved, constitutional prohibitions against special legislation serve a purpose distinguishable from equal protection provisions. Equal protection is denied when the state unreasonably discriminates *against* a person or class.

Prohibited special legislation, on the other hand, unreasonably and arbitrarily discriminates *in favor of* a person or class by granting them a special or exclusive immunity, privilege, or franchise.

Whether a law is attacked as special legislation or as violative of equal protection, it is still the duty of the courts to decide whether the classification is unreasonable in that it preferentially and arbitrarily includes a class (special legislation) to the exclusion of all others, or improperly denies a benefit to a class (equal protection). [citation omitted] While certain pieces of legislation may be attacked as both special legislation and violative of equal protection since they confer a benefit on one class while denying a benefit to another, there will be many cases where a benefit is conferred on one class to which no other class has a right. In those cases, legislation would be attacked as special legislation but not as violative of equal protection.

*Illinois Polygraph Society v. Pellicano*, 83 Ill.2d 130, 138, 46 Ill.Dec. 574, 579, 414 N.E.2d 458, 463 (1980); *see also Jones v. State Board of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). As discussed above, there is no fundamental right to the benefit of the racing preference. Therefore, we must consider this issue separately from our equal protection analysis.

 A law is general, and thus permissible, if it confers rights and privileges or imposes restrictions upon all members of a given class, when the classification has a reasonable basis. *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744 (1977); *Schrey v. Allison Steel Mfg. Co.*, 75 Ariz. 282, 255 P.2d 604 (1953). A special law applies only to certain members of a class or to an arbitrarily defined class which is not rationally related to a legitimate legislative purpose. *Prescott Courier, Inc. v. Moore*, 35 Ariz. 26, 274 P. 163 (1929); *Albuquerque Metropolitan Arroyo Flood Control Authority v. Swinburne*, 74 N.M. 487, 394 P.2d 998 (1964); *Utah Farm Bureau Insurance Co. v.*

*Utah Insurance Guaranty Ass'n*, 564 P.2d 751 (Utah 1977). If a statute is plainly intended for a particular case and looks to no broader application in the future, it is a special law. *Barbee v. Holbrook*, 91 Ariz. 263, 371 P.2d 886 (1962); *Luhrs v. City of Phoenix*, 52 Ariz. 438, 83 P.2d 283 (1938). But a law is not special simply because it may have only a limited application. Such a law will be general if it applies to all cases and to all members of the specified class to which the law is made applicable. *School District No. 25 v. State Tax Commission*, 101 Idaho 283, 612 P.2d 126 (1980); *Bray v. County Board of Arlington County*, 195 Va. 31, 77 S.E.2d 479 (1953); *see generally* 2 Sutherland Statutes and Statutory Construction § 40.02 at 140 (4th ed. 1973).

■ Based upon these standards, we find that A.R.S. § 5–110(A) is not a prohibited special law. As discussed earlier, the classifications in the statute have a rational basis in furthering the legitimate state objective of encouraging continued investment in the operation of racing meetings. The terms of the statute apply equally to all types of racing and to all members of each class. Thus, the requirements of the racing statutes as well as the privileges are applicable to all members of the class. Although the legislature has been reluctant to expand the number of racing days, it has in the recent past added additional days available for racing. The class has therefore

increased, and, as conditions change, the class can be further expanded.

## CONSTITUTIONALITY OF A.R.S. § 5–108.01(C) AND (D)

AHF attacks the constitutionality of A.R.S. § 5–108.01(C) and (D)[2] arguing that the statute, for all practical purposes, prohibits the establishment of a new horse racing facility in the Phoenix area. AHF particularly objects to that portion of the statute which directs the Racing Commission, before granting a permit for racing at a new race track, to consider the economic effect of such a permit on existing tracks and permittees.

The argument advanced by AHF is essentially the same as that made against A.R.S. § 5–110(A). The constitutional standards of equal protection and due process are not violated simply because the legislature has placed restrictions on the establishment of new horse racing tracks. As pointed out earlier in the discussion of the constitutionality of A.R.S. § 5–110(A), in the field of economic regulation there is wide latitude given to legislative determination of the desirability of particular statutory regulation. *City of New Orleans v. Dukes, supra.* AHF contends that the challenged statutes restrict competition in the racing business. Such restriction or regulation of competition does not cause the statute to be considered unconstitutional. In the liquor in-

---

**2.** C. The commission shall not issue an original permit to conduct a horse racing, harness racing or dog racing meeting at any place, enclosure or track not used for racing purposes pursuant to permits actually issued as authorized by law prior to February 1, 1971, unless before the beginning of construction or preparation of the place, enclosure or track the commission determines that:

1. The conducting of horse, harness or dog racing meetings at such place will serve the public interest, convenience or necessity,

2. The plan of racing is economically feasible,

3. The issuance of a permit is in the best interest of racing and the state of Arizona generally, and

4. Nothing in this subsection shall be construed to permit any place, enclosure or track used for horse, harness or dog racing on or before February 1, 1971, to be used for any

other type of animal racing, except that in counties with a population of less than seven hundred thousand as shown by the last United States census, a place, enclosure or track used for one type of animal racing may be used for any other type of animal racing. In considering an application for a permit under this section, the commission shall give consideration to the number and location of existing tracks, the number of permits already granted and the economic effect the granting of a new permit may have on existing tracks and permittees and the revenues of the state of Arizona.

D. If the owner or lessee of any place, enclosure or track used for racing purposes pursuant to permits issued as authorized by law on or before February 1, 1971, is obligated for any reason to abandon the use of the place, enclosure or track, he may transfer the use and rights to use the premises for racing purposes to any other location in the same county.

dustry heavy state regulation has been held not violative of restraint of trade prohibitions both because of the 21st amendment and the unique nature of the industry. The racing industry necessarily involves gambling which by its nature is more attractive to fraudulent schemes than most industries. To protect the public we find the comprehensive legislative scheme, although admittedly restrictive of competition, is necessary to control the possibility of serious abuses.

 The legislative determination to regulate competition on the number of race tracks for horse racing bears a legitimate relationship to the desire of the state to maximize the revenue generated for the state treasury. In this regard the legislature has determined that unrestricted competition is not the desirable method to be used to gain the state's objective. Whether the decision of the legislature is the correct or the most effective way to achieve the desired goal is not for the courts to determine, as long as there is some rational basis for the method chosen. *Minnesota v. Clover Leaf Creamery Co., supra.*

We conclude that A.R.S. § 5–108.01(C) and (D) are constitutional.

## LEGALITY OF THE 1956 LEASE

The appellees challenged the validity of the 1956 lease between Downs and Turf. The trial court ruled that paragraph 1 of the lease violated the Arizona antitrust law (A.R.S. § 44–1401 *et seq.*).

The specific provision of the lease which the trial court found to be in violation of the antitrust statutes states:

> The parties hereto agree that during the term of this agreement the total number of racing dates legally available to the parties hereto in a racing season shall be divided equally, one-half (½) thereof to First Party and one-half (½) thereof to Second Party ....

> The parties hereto agree that ... they will alternate each year in applying for the racing days in the first half and in the last half of each racing season ....

The quoted provisions of the lease provide for two different conditions: first, an agreement that the parties will share equally in the total number of days available to both of them; and second, an agreement that the parties will alternate each year in applying for parts of the racing season.

The appellees contend that the lease agreement is an agreement not to compete in racing applications and constitutes a horizontal market allocation and a per se violation of the state antitrust law. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967).

 Generally, provisions such as that contained in the 1956 lease would constitute a violation of the antitrust statutes, but there are instances when provisions of an agreement which might normally be considered contrary to the antitrust law are nevertheless specifically authorized by other statutes. When this occurs the principle of statutory construction is that where there is a conflict between separate state statutes [3], the specific statute should govern over the general. *State v. Davis,* 119 Ariz. 529, 582 P.2d 175 (1978); *Peabody Coal Co. v. Navajo County,* 117 Ariz. 335, 572 P.2d 797 (1977); *State v. Rice,* 110 Ariz. 210, 516 P.2d 1222 (1973).

An illustration of the principle that the specific governs over the general is found in *State ex rel. La Sota v. Arizona Licensed Beverage Ass'n.,* 128 Ariz. 515, 627 P.2d 666 (1981) in which we upheld agreements authorized under Arizona's fair trade act establishing minimum resale prices despite the provisions of the state antitrust laws prohibiting price fixing. We concluded that the fair trade act was passed by the legisla-

---

**3.** It is significant that the antitrust claim here is based on the Arizona Antitrust Act (A.R.S. § 44–1402) rather than the Federal Sherman Antitrust Act (15 U.S.C. § 1). Therefore, the conflicting statutes in this case (A.R.S. §§ 5– 110, 44–1402), both of which were passed by our Legislature, are competing on an equal footing and common rules of statutory construction are dispositive of this challenge.

ture as an exception to the general act, the antitrust law.

Are the challenged provisions of the 1956 lease authorized by statute? The latter portion of the challenged provision providing for alternating racing seasons is clearly authorized by A.R.S. § 5–110(A), which states in relevant part: "In the event two or more permittees shall have agreed that the dates to be allotted to each of them each year shall be alternated from one year to the next, . . . such agreement shall be recognized by the commission . . . ." A.R.S. § 5–110(A).

The portion of the challenged lease provision providing for the equal division of race dates is not *currently* authorized by statute. At the time the lease was executed, however, A.R.S. § 5–108.01 provided in part:

A. When two or more applications by qualified applicants are filed with the commission seeking racing permits . . . to conduct racing on the same day or dates within the same county for harness or horse racing, a conflict shall be deemed to exist . . . .

B. In the event of a conflict the qualified applicants shall attempt to resolve such conflict by an agreement in writing in which agreement each such applicant shall receive and be allocated dates in such manner as will eliminate such conflict, to be filed with the commission on or before the thirtieth day of June following the filing of such applications.

The foregoing provisions of law were in effect from 1956 to 1968. During the twelve year period that the statute was in effect, the policy of the state was that applicants for horse racing days should resolve conflicts by agreeing to the allocation of racing dates in a manner which would eliminate conflicts between the applicants. The challenged provision of the lease agreement between Downs and Turf was in harmony with the intent of the legislature as expressed in the 1956 version of A.R.S. § 5–108.01.

In 1968 the legislature repealed A.R.S. § 5–108.01 (Laws 1968, Ch. 152, § 11), and amended A.R.S. § 5–110 to provide:

[I]n the event there is a conflict in dates requested between two or more permittees in the same county for the same kind of racing, then and in such event, the permittee whose application is for substantially the same dates as were allotted to him in the preceding year shall be entitled thereto in preference to any other permittee.

(Laws 1968, Ch. 152, § 6). After 1968 the legislature provided that the Racing Commission would allocate the racing dates to applicants on a historical basis, that is, an applicant was entitled to be allotted substantially the same dates as were allotted to him the previous year.

The challenged provision of the lease agreement providing for the sharing of racing dates was valid when entered into, and the subsequent repeal of the statute which authorized the agreement should not operate to penalize Downs, especially since the provision in question is no longer sought to be enforced. This court has previously held that a citizen should be able to rely upon the validity of a statute until repealed or declared unconstitutional, without penalties for such reliance. *Shreve v. Western Coach Corp.*, 112 Ariz. 215, 540 P.2d 687 (1975); *Austin v. Campbell*, 91 Ariz. 195, 370 P.2d 769 (1962); *Texas Co. v. State*, 31 Ariz. 485, 254 P. 1060 (1927).

Since the challenged provision is superfluous in light of the 1968 amendments to the racing statutes, the provision may be deemed severable from the remainder of the lease agreement. *See Tom Maxwell Realty, Inc. v. Jennings*, 93 Ariz. 146, 379 P.2d 131 (1963); *Hackin v. Pioneer Plumbing Supply Co.*, 10 Ariz.App. 150, 457 P.2d 312 (1969); Restatement (Second) of Contracts, § 183 (1981). As thus severed, the lease agreement does not violate the state antitrust law.

In summary, we hold that the challenged statutes, A.R.S. § 5–108.01(C) and (D) and A.R.S. § 5–110(A), are constitutional. We also hold that paragraph 1 of the lease between Downs and Turf does not violate the antitrust laws of this state.

The judgments appealed from are reversed, and the matter is remanded to the superior court for further proceedings consistent with the views expressed in this opinion.

HAYS and CAMERON, JJ., and JACK L. OGG, Court of Appeals Judge, concur.

GORDON, Justice (specially concurring).

I concur in the result, that Arizona Horsemen's Foundation, Inc. (AHF), is denied racing dates in Maricopa County. It is my personal observation that AHF's entry into the horse racing industry is not a genuine attempt to inject competition into this market. There are indications in the record before this Court that AHF is somehow affiliated with appellee, Turf Paradise.

Therefore, to hold that AHF should be able to participate in the legally available racing dates would not result in increased competition in the horse racing industry.

Had this been a case where a bona fide entrant with adequate financial resources and experience had endeavored to enter the industry I would not insulate the two industry members from the rigors imposed by a new competitor.